**WITTELS MCINTURFF PALIKOVIC**
Steven L. Wittels
J. Burkett McInturff
Susan J. Russell* (*pro hac vice motion forthcoming*)
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile:  (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
sjr@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship
Chantal Khalil
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com
ckhalil@fbfglaw.com

*Lead Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGELA GLIKIN, <br><br> on behalf of herself and all others similarly situated, <br><br>                  Plaintiff, <br><br>        v. <br><br> MAJOR ENERGY ELECTRIC SERVICES, LLC, <br><br>                  Defendant. | **CLASS ACTION COMPLAINT** <br><br><br><br><br> **JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

NATURE OF THE CASE ................................................................................................... 1

OVERVIEW OF DEFENDANT'S UNLAWFUL CONDUCT ...................................................... 2

JURISDICTION AND VENUE ....................................................................................... 10

PARTIES ................................................................................................................. 10

FACTUAL ALLEGATIONS ........................................................................................... 15

RULE 9(B) ALLEGATIONS ......................................................................................... 45

CLASS ACTION ALLEGATIONS ................................................................................... 49

CAUSES OF ACTION ................................................................................................. 52

    COUNT I – BREACH OF CONTRACT .......................................................................... 52

    COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
              AND FAIR DEALING ..................................................................................... 53

    COUNT III – NEW YORK GENERAL BUSINESS LAW § 349 ........................................ 54

    COUNT IV – NEW YORK GENERAL BUSINESS LAW § 349-d .................................... 56

    COUNT V – UNFAIR AND DECEPTIVE ACTS AND PRACTICES ............................... 58

    COUNT VI – VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT .. 61

    COUNT VII – FRAUD BY CONCEALMENT .................................................................. 63

    COUNT VIII – UNJUST ENRICHMENT ....................................................................... 65

PRAYER FOR RELIEF ............................................................................................... 65

JURY DEMAND ....................................................................................................... 66

Plaintiff Angela Glikin (hereinafter "Ms. Glikin" or "Plaintiff"), by her attorneys Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, brings this consumer protection action in her individual capacity, and on behalf of a Class of consumers defined below, against Defendant Major Energy Electric Services, LLC (hereinafter "Major Energy" or "Defendant") and hereby alleges the following with knowledge as to her own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.      Defendant Major Energy is an independent energy service company ("ESCO"). This consumer protection class action arises from Major Energy's fraudulent and bad faith conduct while "supplying" electricity to residential consumers across the United States, causing tens of thousands of consumers to pay considerably more than they bargained for electricity and gas.

2.      Traditionally, residential energy was supplied by regulated utilities like New York's Con Edison.  The utilities' rates were strictly controlled.  In the 1990s, however, Enron's unprecedented lobbying campaign resulted in deregulation of state energy markets such that consumers were permitted to choose from a variety of companies selling residential energy.

3.      Unfortunately, some unscrupulous energy suppliers, like Major Energy, have exploited deregulation by deceiving consumers hoping to save on their residential energy costs. Specifically, Major Energy has taken advantage of the lack of regulatory oversight by engaging in price gouging and deceptive and unlawful marketing practices designed to profiteer at the expense of the consuming public.

4.      Plaintiff and the Class of Defendant's gas and electric customers defined below have been injured by Defendant's unlawful practices.  Plaintiff and the Class therefore seek

damages, restitution, statutory penalties, and declaratory and injunctive relief for Major Energy's fraud, violation of state consumer protection statutes, breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment.  Residential energy costs are a significant portion of most families' budgets.  To prey on consumers as Defendant has done here is unconscionable.

5.     Only through a class action can Major Energy's customers remedy Defendant's ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Major Energy's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers do not realize they are victims of Major Energy's deceptive and unlawful conduct.  With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like Major Energy engage in fair and upright business practices.

## OVERVIEW OF DEFENDANT'S UNLAWFUL CONDUCT

6.     Price is the most important consideration for energy consumers.  Given that there is no difference at all in the electricity or natural gas that ESCOs supply as opposed to the consumer's local utility, the only reason a consumer switches to an ESCO is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility.  That is, after all, the point of energy deregulation.

7.     Major Energy's business model includes acquiring smaller ESCOs that have cultivated sizable customer bases by promising to provide consumers with competitive energy rates, including variable rates based on energy market conditions.  Entrust Energy, Inc. ("Entrust Energy"), another ESCO that is not a defendant here, was one such entity.

8.      In the Winter of 2013, Plaintiff Glikin, a Maryland resident, switched her electricity account to Entrust Energy, which then sent Plaintiff a letter enclosing the "Disclosure Statement and Terms of Service that describe your total Agreement with us" including her enrollment in a fixed-rate plan for electricity at 9.5¢ per kilowatt-hour (kWh).  This contract is attached hereto as **Exhibit A**.  The contract defines itself as the "Agreement." *Id.* at 2.  Per the Agreement, if Ms. Glikin took no action once the fixed-rate period ended, her rate would shift to a variable rate that "may be adjusted monthly to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors." *Id.*  This contract was binding not only on the parties to the Agreement, but also their "respective successors and legal assigns" and explicitly permitted Entrust Energy to "assign this Agreement and the rights and obligations there under [*sic*], to another energy supplier. . . ." *Id.* at 2–3.

9.      In 2016, Entrust Energy assigned the Agreement to National Gas & Electric, LLC (while "National Gas & Electric" or "NG&E" is not a defendant here, it is owned and operated by the same entities and individuals that own and operate Defendant Major Energy).  The May 6, 2016 letter from NG&E informing Plaintiff of the assignment is attached hereto as **Exhibit B**. The letter states in pertinent part that "[N]o action is required on your part for this transfer to occur" and that NG&E "will honor your current agreement in place with Entrust and there will be no changes to the terms or conditions through the life of your current contract." *Id.* at 1.  In or around October 2016, Plaintiff's fixed rate plan ended, and she was automatically defaulted onto NG&E's variable rate plan in accordance with the Agreement.  Per the Agreement's terms, the contract then began to indefinitely "automatically renew" on a "month-to-month" basis.  Ex. A at 2.

10.     In 2018, NG&E assigned the Agreement to Defendant Major Energy.  In its March 14, 2018 letter advising Plaintiff of the assignment, Major Energy represented to Plaintiff that "No Action was Required," and that "Major Energy will honor your current agreement in place with National Gas & Electric and there will be no changes to the terms or conditions through the life of your current contract."  Major Energy's letter is attached hereto as **Exhibit C**. The letter further specified that "[i]f you are currently served under a variable rate with National Gas & Electric, your service will continue under the same variable ELECTRIC rate."  *Id.* at 1. The letter also emphasized that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."  *Id.*

11.     This promise of competitive prices turned out to be false, as Major Energy's rates were not "competitive" in any sense of the word.  As detailed below, Major Energy's exorbitant energy rates were set in bad faith and bear no resemblance to competitive rates otherwise available in the marketplace.  Among other unsettling characteristics, Major Energy's rates were higher than Plaintiff's local utility's rates ***100%*** of the time.  In fact, Major Energy's rates were ***always*** at least ***double*** the rate Plaintiff's utility charged for ***the exact same energy***.  According to 2018 aggregate data from U.S. Energy Information Administration, of the 54 ESCOs that served Maryland consumers in 2018, Major Energy's rates were the second highest.  The average variable rate Major Energy charged Plaintiff in 2018 (18.57¢ per kWh) was 90.42% higher than the average rate among Major Energy's primary Maryland ESCO competitors in 2018 (excluding the local utilities).  Indeed, Plaintiff's average 2018 rate was higher than the average rate of retail electricity in Maryland every single year for the 17-year period from 2002 to 2019.[1]

---

[1] U.S. Energy Information Administration (www.eia.gov), Electricity Data Browser: "Average retail price of electricity" for "Maryland," "Residential."  Last visited Jan. 14, 2121.

12.     Major Energy's variable rates were also not consistent with the Agreement's requirement that variable rates "reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors." Ex. A at 2. As set forth below, Major Energy's variable rates were untethered to market conditions and thus Major Energy breached the Agreement with Plaintiff and other similarly situated consumers. Major Energy exploits the lack of transparency and oversight over its actual pricing practices, as well as the dramatic information asymmetry between Major Energy and its customers, to artificially inflate its rates so high that its variable rate methodology is rendered meaningless. Consequently, Major Energy's variable rates are consistently substantially higher than those otherwise available in the energy market, and its rates do not reflect changes in market conditions for the energy it supplies to its retail customers. No reasonable customer, including Plaintiff, would interpret "reflect market conditions" to mean that Major Energy can exercise unfettered discretion to artificially inflate its rates—so much so that the rates bear no resemblance to contemporaneous wholesale prices or competitors' retail rates—in order to maximize profits at the expense of the consuming public.

13.     To the extent Major Energy claims it had discretion to set its variable rates, Defendant violated the implied covenant of good faith and fair dealing by exercising any price setting discretion it may have had in bad faith and in a manner inconsistent with Plaintiff's and other consumers' reasonable expectations. Consumers expect to pay Major Energy competitive prices for their residential energy and they did not expect Major Energy to profiteer off of consumers in excess of commercially reasonable profits. Even if Major Energy had unilateral discretion to set its variable energy rates (and it did not), Plaintiff and other reasonable consumers expect that notwithstanding Defendant's profit goals, its variable rates would reflect

the wholesale prices or competitors' retail rates and that Defendant would refrain from gouging the price on the exact same product sold by consumers' local utilities.  Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy energy from Defendant.  Of course, no consumer would ever agree to Major Energy's variable rate if they knew the truth: that Major Energy's rates for the exact same energy would always be substantially higher than the utility rate, other competitors' rates, and Major Energy's fixed rate offerings.  As a consequence, the only way Major Energy keeps its variable rate customers is by hiding the fact that its variable rate is untethered from prevailing market conditions, consistently substantially higher than competitors' retail rates, and priced purely to maximize Major Energy's profits at the expense of the consuming public.

14.    Major Energy thus committed the following unfair and deceptive acts and practices in violation of Maryland, New York, and other state consumer protection statutes:

   a.    Major Energy failed to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

   b.    Major Energy failed to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the consumer were to stay with the local utility;

   c.    Major Energy failed to provide customers adequate advance notice of the variable rates it would charge;

   d.    Major Energy failed to adequately disclose the variable rate methodology it used to calculate its variable rates to enable consumers to potentially compare prices;

   e.    Major Energy failed to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

   f.    Major Energy failed to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference

between the costs Major Energy incurs for its fixed rate customers and those it incurs for its variable rate customers;

g.    Major Energy falsely represented that customers who elect to purchase Defendant's variable rate energy will save money compared to their local utilities or other ESCOs when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."; and

h.    Major Energy falsely represented that its variable rates correspond closely to market pricing when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."

15.    Major Energy's omissions and representations are false and deceptive, and designed to take advantage of consumers' good faith and the lack of consumers' knowledge of the wholesale and retail energy markets. In reality, Major Energy did not provide its customers with competitive, market-based rates but rather used a pricing methodology that focused on maximizing its own profits at unsuspecting consumers' expense. The variable rates Major Energy charged its customers are substantially higher than those otherwise available in the retail energy market (including the fixed rates Major Energy charges its other customers), and its rates do not reflect market conditions, *i.e.*, changes in the wholesale energy market.

16.    As a result, tens of thousands of unsuspecting consumers are being fleeced by Major Energy out of millions of dollars in exorbitant charges for electricity and gas. Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

17.    Plaintiff is but one of tens of thousands (and possibly hundreds of thousands) of consumers harmed by Major Energy's conduct. For example, on March 9, 2018, the Attorney General of the State of Illinois filed a lawsuit against Major Energy alleging that it had fraudulently marketed its services to Illinois residents since at least 2012. The Illinois Attorney General's press

release announcing the lawsuit described Major Energy's marketing and sales practices as

"misleading thousands of Illinois customers about the company's costly electricity contracts" and

calculated that during the six years prior to the lawsuit "Major Energy customers have paid nearly

$2.5 million more in rates and extra fees than they would have paid if they had remained with the

regulated utility."[2]  The Attorney General's press release did not mince words about the business

practices giving rise to the lawsuit: "Major Energy's business model is nothing more than outright

fraud."  *Id.*

18.     The Illinois Attorney General's lawsuit against Major Energy challenged

practices that are nearly identical to the conduct that harmed Plaintiff and Class Members, to wit:

> "Major claims that customers will save on their electricity bills, while consumers
> almost always end up paying more than the [local utility's] rate."[3]
>
> "Major conceals the terms and conditions of its variable rates."[4]
>
> "Major routinely fails to disclose how these variable rates are calculated, how the
> consumer's bill can substantially increase at any given time, and how the consumer
> receives no added benefit at a dramatically higher price than if the consumer were to
> stay with the public utility."[5]

19.     On October 10, 2018, the Illinois court presiding over the Attorney General's

lawsuit denied Major Energy's motion to dismiss, *People v. Major Energy Elec. Servs., LLC*, 2018

WL 8544536 (Ill. Cir. Ct. Oct. 10, 2018), after which Major Energy's leadership at that time

"'deci[ded] to cease [Major's] marketing in Illinois and evaluate pretrial resolution options' with the

---

[2] Press Release, "Madigan Alleges Major Energy Electric Services Charged Customers Nearly $2.5 Million More for Electricity than Traditional Utility Companies," April 9, 2018 *available at*: https://illinoisattorneygeneral.gov/pressroom/2018_04/20180409.html (last visited Jan. 14, 2121).

[3] Compl. for Injunctive and Other Relief, ¶ 45, *People v. Major Energy Electric Services LLC*, 2018 CH 0459 (Ill. Cir. Ct. Mar. 9, 2018), attached hereto as **Exhibit D**; *see also id.* at ¶ 2 ("Almost 98% of the time Major billed customers at a rate higher than the [local utility] rate.").

[4] *Id.* at ¶ 85.

[5] *Id.* at ¶ 87.

Illinois Attorney General." *Major Energy Elec. Servs., LLC v. Horowitz*, No. 19 Civ. 10431 (NRB), 2020 WL 4432121, at *3 (S.D.N.Y. July 31, 2020); *see also Horowitz* ECF No. 20-2 at 2 (Major Energy's lawyers in the *Horowitz* case admitting that Major Energy's then-President began "authorizing settlement offers to the Attorney General in Illinois in excess of several hundreds of thousands of dollars shortly after the filing of the Illinois Lawsuit, as well as the subsequent denial of Major Energy's Motion to Dismiss in the Illinois Lawsuit and critical comments from the Court in subsequent hearing(s) . . . ."); *Horowitz*, ECF No. 23 at 9 (Major Energy's counsel in *Horowitz* admitting that Major Energy's then-President and others "were aware that Major Energy was not in compliance with Illinois law based on the facts and circumstances that gave rise to the Illinois Attorney General's 2018 lawsuit . . . .").

20.    On August 16, 2019, Major Energy settled the Illinois Attorney General's lawsuit and agreed to a Final Judgment and Consent Decree requiring it to pay a $2,000,000 civil monetary penalty and permanently enjoining it from a range of conduct in Illinois. *Horowitz*, 2020 WL 4432121, at *3.

21.    On July 31, 2020, Judge Buchwald of the United States District Court for the Southern District of New York found that Defendant Major Energy (now suing its former President and others seeking indemnity for the Illinois Attorney General's lawsuit and years of unpaid taxes) ***admitted*** "in fact" that Major Energy had "fraudulently marketed its services as alleged in the Illinois Attorney General's complaint . . . and that 'the evidence adduced' in the litigation 'demonstrates' that [Major Energy] did." *Id.* at *4 (citations omitted); *see also id.* (Judge Buchwald noting Major Energy's ***admission*** that it "had fraudulently marketed its services to Illinois residents as alleged in the Illinois Attorney General's complaint.").

22.    Notably, as discussed below, while Major Energy has been involved in at least

*five* separate regulatory enforcement actions concerning its deceptive practices, these actions have recovered only a small fraction of the tens of millions of dollars Major Energy has unlawfully taken from consumers.  The purpose of this action is to finally return consumers their hard-earned money.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

23.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

### *Personal Jurisdiction*

24.     This Court has general personal jurisdiction over Major Energy because Major energy is a citizen of New York.

25.     This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution, and sale of electricity to New York consumers.

### *Venue*

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District, as Defendant is headquartered in this District.

## PARTIES

27.     Plaintiff is a citizen of Maryland residing in Monkton, Maryland.  Ms. Glikin was a Major Energy customer from April 2018 to January 2020.

28.     Defendant Major Energy Electric Services LLC, d/b/a Major Energy, is a New York limited liability company with offices in New York at 100 Dutch Hill Road, Suite 230, Orangeburg.  Major Energy's sole member is Spark Holdco, LLC.  Spark Holdco, LLC is a limited liability company whose members are Spark Energy, Inc., Retailco, LLC, and NuDevco Retail, LLC ("NuDevco").  Spark Energy, Inc. is a Delaware corporation with its principal place of business in Texas.  Retailco is a limited liability company whose sole member is TxEx Energy Investments, LLC ("TxEx"), whose sole member is W. Keith Maxwell III, a citizen of Texas. NuDevco is a limited liability company whose sole member is NuDevco Retail Holdings LLC, which is a limited liability company whose sole member is Electric HoldCo, LLC, which is a limited liability company whose sole member is TxEx.

29.     Several relevant acts took place in New York:  As a New York company, Major Energy processes enrollment transactions and payments in New York; directs marketing, billing, customer outreach, service, and tracking efforts from New York; received payments from Plaintiff and Class Members and maintains a bank account in New York.

30.     Major Energy has amassed a damning public dossier.  The following facts unearthed by Plaintiff's counsel's pre-suit investigation document the pervasive nature of the Major Energy business practices challenged in this lawsuit.

31.     Despite its tens of thousands of customers, Major Energy is not accredited with the Better Business Bureau (the "BBB") and the BBB's Major Energy webpage contains a "Current Alert for This Business" notifying the consuming public that "BBB files indicate a pattern of complaints concerning the company's sales practices and customer service

department."[6]  Specifically, the BBB's alert states that "consumers allege that not only do the[]

promised savings not materialize, their utility bills have doubled from what they had been paying

with a previous utility provider" and that consumers "felt misled or confused by the lack of

explanation about the availability of fixed and variable rates . . . ."  *Id.*  The BBB's "Current

Alert" follows more than six years of regulatory enforcement actions against Major Energy.

32.     On August 20, 2014, the Illinois Commerce Commission made public the

"Consumer Services Division and Office of Retail Market Development Staff Report to the

Commission" on Major Energy.[7]  This report contained the following findings that essentially

foreshadow this lawsuit:

- Major Energy's variable rate prices "were as high as 34.98 cents/kWh, while the average [local utility] residential electric supply rate for the period between June 2013 and May 2014 was 5.87cents/kWh." *Id.* at 3.

- Major Energy's contract "does not include . . . an adequate explanation of how the variable rate charges for service are determined . . . ." *Id.* at 5.

- Major Energy's sales script did not include "an adequate explanation of the variable rate that would be applied under the contract" or a "statement in plain language describing the conditions that must be present for the savings to occur when an implied guarantee of savings was made." *Id.*

- Major Energy's sales script "makes no effort to inform the prospective customer that the rate is variable, and could provide either savings or higher costs to customers, depending on the variation of the rate." *Id.* at 4.

- "Most . . . . consumers [that contacted the Consumer Service Division] complained of high rates and alleged they were misled because they thought they were going to save money compared to the utility supply rate when they signed up with Major Energy for electric supply service." *Id.* at 2.

---

[6] Better Business Bureau, *available at:* https://www.bbb.org/us/ny/orangeburg/profile/energy-service-company/major-energy-services-llc-0121-103141/complaints (last visited Jan. 14, 2121).

[7] Staff Report, *available at:* https://www.icc.illinois.gov/docket/P2014-0512/documents/217973 (last visited Jan. 14, 2121)

33.     On April 15, 2015, Major Energy settled with the Illinois Commerce Commission and agreed to issue $262,500 in refunds to Illinois consumers.[8]

34.     According to the Illinois Attorney General's March 9, 2018 complaint against Major Energy discussed in paragraphs 18-21 above, "[t]he misconduct detailed in [the Attorney General's] complaint continued even after Major's April 15, 2015 settlement" and thus "Major has a documented history of engaging in deceptive conduct, which continued even after the [Illinois Commerce Commission] put Major on notice about its unlawful practices and Major agreed to change its practices."  Ex. D at ¶¶ 151–52.  Yet, Major Energy did not reform its practices.

35.     On February 26, 2016, the Maryland Public Service Commission adopted an Administrative Law Judge's ruling which imposed $300,000 in civil penalties on Defendant as a result of an investigation into the company's marketing practices.[9]  The Maryland Public Service Commission then upheld the civil penalty over Major Energy's objection based on the evidence that Major Energy's sales and marketing practices emphasized savings and lower costs but failed to deliver on those promises and instead Major Energy charged variable rates that significantly exceeded consumers' local utilities' rates.  *Id.* at 6.

36.     The Maryland Public Service Commission also upheld a moratorium on Major's variable rate marketing practices because "eliminat[ing] it would potentially allow Major's sales

---

[8] Stipulation and Settlement of All Issues Presented for Determination in Docket No. 14-0512 at 4, *available at*: https://www.icc.illinois.gov/docket/P2014-0512/documents/229233 (last visited Jan 14, 2020).

[9] Public Service Commission of Maryland Order No. 87418, *available at*: https://www.psc.state.md.us/wp-content/uploads/Order-No.-87418-Case-Nos.-9346-and-9346b-Appeal-Order.pdf (last visited Jan. 14, 2121)

and marketing transgressions to continue." *Id.* The moratorium was to be in place until Major Energy took the following actions:

- Modified "its sales script to require its sales agents to discuss the nature and risks associated with the variable rate, to represent that there is no guarantee the customer will see savings in any given month over the default energy rate in effect at the time of the solicitation, to disclose the current established variable rate to allow the customer to compare it to the price to compare on the utility bill and to describe how to obtain the monthly variable rate in effect thereafter;" and

- "[R]evise its sales agreement to provide similar disclosures to advise the customer in more detail the nature and risk of a variable rate."

37.    In the first quarter of 2016 Defendant Major Energy's ownership was sold to National Gas & Electric.  A few months later, NG&E dropped Major Energy down to its affiliate Spark Holdco, whose members are Spark Energy, Inc., Retailco, LLC, and Nudevco (collectively "Spark Energy")—Defendant Major Energy's current owners.  This change of ownership did not, however, usher in any changes to Defendant's business model of taking advantage of consumers.  Major Energy's senior leadership stayed in place until March 2019 and the Spark Energy leadership that eventually took over had an equally dubious documented history of consumer fraud.

38.    For example, on May 29, 2019, the Staff of the Public Utilities Commission of Ohio ("PUCO") concluded that the same individuals and entities that own and manage Defendant Major Energy had "degraded" another recently acquired ESCO's "adherence to Ohio requirements since taking over control and has a history of similar actions in other states."[10] This history in other states served as "aggravating factors" to support the PUCO staff's

---

[10] A Report by the Staff of the Public Utilities Commission of Ohio in Case No. 19-0958-GE-COI at 27 *available at*: http://dis.puc.state.oh.us/TiffToPDf/A1001001A19E30A92423F05161.pdf (last visited Jan. 14, 2021).

conclusion that the recently acquired ESCO lacked the managerial capabilities necessary to provide adequate service to Ohio's customers.  *Id.* at 24–25.

39.     Regulatory actions against the current management and ownership of Defendant Major Energy are legion.  For example, on November 6, 2019, Spark Energy affiliate Verde Energy disclosed to PUCO the existence of *21* regulatory investigations or enforcement actions against Spark Energy entities.[11]  Further, in addition to the actions against Major Energy detailed above, on *eight* different occasions, various state utility regulatory and State Attorneys General formally alleged that other Spark Energy affiliates engaged in misconduct.[12]

## FACTUAL ALLEGATIONS

## I.   Background on Energy Deregulation and the Resulting Wide-Spread Fraud

40.     States across the United States began deregulating their retail energy supply markets in the 1990's.  For example, Maryland's state legislature passed the Electric Customer Choice and Competition Act of 1999 ("Electric Choice Act"), which enabled residential customer to purchase electricity from ESCOs in addition to their local utility.

41.     ESCOs play a middleman role: they purchase energy directly or indirectly from companies that produce energy and sell that energy to end-user consumers.  However, ESCOs do not ***deliver*** energy to consumers.  Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer.  ESCOs merely buy gas and

---

[11] Verde Energy USA Ohio, LLC's Competitive Retail Natural Gas Renewal Application at 22–29 (listing *inter alia* the Illinois Attorney General's action against Major Energy (No. 6), the New York Public Service Commission's investigation of Major Energy (No. 13), and Defendant Major Energy's participation in the Connecticut Public Utilities Regulatory Authority's "Amnesty Program" requiring refunds to consumers because of Major Energy's failure to give advance notice of the next month's variable rate (No. 19)).

[12] *See* Direct Testimony of Barbara R. Alexander On Behalf of the Office of Ohio Consumers' Counsel Case No. 19-0958-GE-COI at 13–17 (chronicling actions attaching relevant documents) *available at*: http://dis.puc.state.oh.us/TiffToPDf/A1001001A19J02B53805C00538.pdf (last visited Jan. 14, 2121).

electricity and then sell that energy to end-users with a mark-up.  Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver gas or electricity, but merely buy energy from a producer and re-sell it to consumers.

42.     If a customer switches to an ESCO, the customer's existing utility continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.

43.     After a customer switches to an ESCO, the customer's energy supply charge (based either on a customer's kilowatt hour [electricity] or therm [gas] usage) is calculated using the supply rate charged by the ESCO and not the regulated rate charged by the customer's former utility.  The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh") or therms multiplied by the rate.  For example, if a customer uses 145 kWh at a rate of 10.0¢ per kWh, the customer will be billed $14.50 (145 x 10¢) for their energy supply.

44.     Deregulation was intended in part to "establish choice of electricity supply" and "provide economic benefits for all customer classes."  MD Code, Pub. Utility Companies, § 7-504.  Deregulation laws in other states are substantially similar.

45.     Deregulation enables ESCOs to be more competitive, aggressive, and creative than monopolistic utilities in reducing wholesale purchasing costs, thereby lowering prices for retail customers.  The public policy motivation in New York, Maryland, and other states for allowing consumers a choice of energy suppliers is to enable retail customers to financially benefit from the increased competition between suppliers in the open market by paying lower rates for energy supply.

46.     Under Maryland's Electric Choice Act, ESCOs supply the energy, while local utilities continue to deliver energy to consumers and manage billing.  Generally, the local utility

becomes the "default service provider" for people who do not choose an alternative supplier.[13] Consumers who do not choose to switch to an ESCO for their energy supply continue to receive it from their local utility.

47.     Because the local utility is the default energy supplier and has the largest customer base in virtually all utility regions—including Plaintiff's utility region—the local utility is every ESCO's primary competitor and the utility's rates by definition represent energy market pricing.

48.     Utilities charge their customers a rate based on market prices for supply obtained in the competitive wholesale marketplace, plus other wholesale costs, namely ancillary services, transmission, line losses, capacity, and administrative costs (*i.e.*, the same costs ESCOs like Major Energy incur)—without any markup or profit.  Because utility rates do not include any profits, they serve as pure reflections market conditions.

49.     Unlike heavily-regulated utilities, ESCOs have many options to buy energy at wholesale, including owning their own energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer (the "spot" market); and by purchasing energy in advance of the time it is used by consumers (the "futures" market).  ESCOs like Major Energy can also purchase wholesale energy from short-term markets, at the same price as the utilities.  The purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce energy costs and pass those savings on to consumers.

50.     Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do.  Indeed, Major Energy offered

---

[13] MD Code, Pub. Utility Companies Section 7-510.

fixed rates during the time Plaintiff was a Major Energy customer that were competitive with utility rates, and that were a fraction of its variable rates.

51.     In fact, Major Energy's initial fixed rate offerings are almost always below or about the same as the comparative local utility rate.  Major Energy does not offer its new customers a product that starts out as a variable rate.  If it did so, consumers would be able to see that Major Energy's variable rate is outrageously high and detached from market conditions, and no consumer would ever agree to Major Energy's variable rate if they knew the truth—that the rate would always be substantially higher than the utility rate and substantially higher than the Major Energy's fixed rate offerings.  As a consequence, the only way Major Energy can keep its variable rate customers is by hiding the fact that its variable energy rates are invariably substantially higher than utility rates and the rates other ESCOs (including Major Energy) charge and that the primary component of the variable rate is not Major Energy's actual costs but Major Energy's unbridled price gouging and profiteering.

52.     As any reasonable consumer would expect, there are only two aspects of prevailing market conditions for energy that affect Major Energy's sales of energy to consumers: supply side, as reflected in the state of wholesale market pricing, and demand side, as reflected in the rates Major Energy's competitors (including Major Energy's primary competitor, local utilities) charge retail customers.

53.     As part of the deregulation plan, ESCOs (like Major Energy) do not have to file or seek approval for the energy rates they charge or the methods by which they set their rates with state utility regulators.

54.     Almost all states that deregulated their energy markets did so in the mid- to late-1990s.  This wave of deregulation was frantically pushed by then-corporate superstar Enron.  For

example, in December 1996 when energy deregulation was being considered in Connecticut,

"the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . .
> It can be done quickly.  The key is to get the legislation done fast.[14]

55.     Operating under this concocted sense of urgency, the states that deregulated

suffered serious consumer harm.  For example, in 2001, 42 states had started the deregulation

process or were considering deregulation.  Today, the number of full or partially deregulated

states has dwindled to only 17 and the District of Columbia.  Even within those states, several

have recognized deregulation's potential harm to everyday consumers—particularly because of

the dramatic information asymmetry between the ESCO and the reasonable consumers—and

thus only allow large-scale customers to shop for their energy supplier.

56.     Responding to widespread abuses, many key players that supported deregulation

now regret the role they played.  For example, reflecting on Maryland's failed deregulation

experience, a Maryland Senator commented: "Deregulation has failed.  We are not going to give

up on re-regulation till it is done."[15]

57.     A Connecticut leader who participated in that state's foray into energy

deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so
> incredibly complex . . . .  If somebody says, no, we didn't screw up, then I don't
> know what world we are living in.  We did.[16]

58.     One of deregulation's main unintended consequences has been the proliferation of

---

[14] Keating, Christopher, "Eight Years Later . . . 'Deregulation Failed,'" *Hartford Courant*, Jan. 21, 2007.

[15] Hill, David, "State Legislators Say Utility Deregulation Has Failed in its Goals," *The Washington Times*, May 4, 2011.

[16] Keating, *supra*.

ESCOs like Major Energy whose business model is primarily based on taking advantage of consumers.

59.     As a result of this widespread misconduct, states like New York began enacting post-deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers."[17]  As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d in 2010, seeks to end the exact type of deceptive conduct Plaintiff challenges here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity and natural gas.  Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.
>
> * * *
>
> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, short-term "teaser" rates followed by *skyrocketing variable prices*—many of the problems recently seen with subprime mortgages are being repeated in energy competition.  Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas.  The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.

*Id*. at 3–4 (emphases added).

60.     Perhaps most notably, G.B.L. Section 349-d provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."  N.Y. GEN. BUS. LAW § 349-d(3).  The statute further provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be

---

[17] ESCO Consumers Bill of Rights, New York Sponsors Memorandum, 2009 A.B. 1558, at 1 (2009) attached as **Exhibit E**.

clearly and conspicuously identified."  N.Y. GEN. BUS. LAW § 349-d(7).

61.     New York regulators are also calling out the high levels of deceptive practices

that pervade deregulated energy markets.  For example, in 2014, the New York's Public Service

Commission (the "NYPSC") concluded that New York's residential and small-commercial retail

energy markets were plagued with "marketing behavior that creates and too often relies on

customer confusion."[18]  The NYPSC further noted, "it is extremely difficult for mass market

retail energy customers to access pricing information relevant to their decision to commence,

continue or terminate service through an ESCO."[19]  The NYPSC concluded as follows:

> [A]s currently structured, the retail energy commodity markets for residential and
> small nonresidential customers cannot be considered to be workably competitive.
> Although there are a large number of suppliers and buyers, and suppliers can readily
> enter and exit the market, the general absence of information on market conditions,
> particularly the price charged by competitors, is an impediment to effective
> competition . . . .[20]

62.     The deceptive conduct of ESCOs like Major Energy has been devastating to

consumers nationwide.  For example, "[a]ccording to the data provided by [New York's]

utilities, the approximately two million New York State residential utility customers who took

commodity service from an ESCO collectively paid almost $1.2 billion more than they would

have paid if they purchased commodity from their distribution utility during the 36-months

ending December 31, 2016."[21]  "Additionally, small commercial customers paid $136 million

more than they would have paid if they instead simply remained with their default utilities for

---

[18] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail
Access Markets, at 4 (Feb. 25, 2014).

[19] *Id*. at 11.

[20] *Id*. at 10.

[21] CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2 (Mar. 30, 2018).

commodity supply for the same 36-month period."[22]   Combining these two groups, New York

consumers have been "'overcharged' by over $1.3 billion over this time period."[23]

63.     New York's low-income consumers have also been hit hard.  The utilities

reported that low-income ESCO customers (a subset of the residential customers mentioned

above) "collectively paid in excess of $146 million more than they would have paid if they took

commodity supply from their utility."[24]

64.     Based on the flood of consumer complaints, negative media reports, and data

demonstrating massive ESCO overcharges, the NYPSC announced in December 2016 an

evidentiary hearing to consider primarily whether ESCOs should be "completely prohibited from

serving their current products" to New York residential consumers.[25]   In other words, the hearing

was to reassess whether New York's deregulation experiment has failed everyday consumers.

65.     Then, on December 16, 2016, the NYPSC permanently prohibited ESCOs from

serving low-income consumers in New York, because of "the persistent ESCO failure to address

(or even apparently to acknowledge) the problem of overcharges to [low income] customers . . .

."[26]

66.     Following the first part of the evidentiary hearing announced in December 2016,

on March 30, 2018, NYPSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed market
> structure that results in customers being fooled by advertising and marketing tricks

---

[22] *Id.* at 3.

[23] *Id.*

[24] *Id.*

[25] CASE 12-M-0476, Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits, at 3 (December 2, 2016).

[26] CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal. Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable.[27]

* * *

The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service. Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers. For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[28]

* * *

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally

---

[27] CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 1 (Mar. 30, 2018).

[28] *Id.* at 41–42 (citations omitted).

opaque choices.[29]

67.     As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied on New York consumers.[30]   Likewise, when the ESCOs claimed that their provision to consumers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[31]   Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[32]

68.     Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers. These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market.  These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[33]

---

[29] *Id.* at 86 (citations omitted).

[30] *Id.* at 37.

[31] *Id.* at 87.

[32] *Id.* at 69.

[33] *Id.*

69.     Then, on December 12, 2019, the NYPSC issued bombshell regulatory changes that ban the *exact same* variable rate pricing practices engaged in by Major Energy—as summarized below—and impact the entire New York ESCO marketplace.[34]

70.     The NYPSC's press release announcing the new regulations stressed that banning variable energy rates was intended to "prevent[] bad actors among ESCOs from overcharging New York consumers" and that the regulations only went forward after "the state's highest court definitively halted ESCOs' attempts to use litigation to evade and/or delay consumer-protection regulation."[35]  The regulations themselves likewise condemn ESCOs' conduct and declare that deception has become a "business model" in the deregulated energy market:

> Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO customers that pay significant premiums for products with little or no apparent added benefit, . . . it appears that a material level of misleading marketing practices continues to plague the retail access market.
>
> * * *
>
> The persistence of complaints related to ESCO marketing practices is indicative of some ESCOs continuing to skirt rules and attempting to avoid accountability as part of their business model.[36]

---

[34] CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process (the "December 12 Order"), at 108–10 (Dec. 12, 2019), *available at*: http://www3.dps.ny.gov/W/PSCWeb.nsf/96f0fec0b45a3c6485257688006a701a/3f6ed8de50c6306185257 687006f3a5f/$FILE/15-M-0127%20Order%20Adopting%20Changes%20to%20the%20Retail%20Access%20Energy%20Market%2 0and%20Establishing%20Further%20Process%2012.12.19.pdf (last visited Jan. 14, 2121).

[35] Press Release, "PSC Enacts Significant Reforms to the Retail Energy Market," December 12, 2019, *available at*: http://www3.dps.ny.gov/pscweb/WebFileRoom.nsf/Web/51A7902329FEA7B7852584CE005CF88D/$Fil e/pr19110.pdf?OpenElement (last visited Jan. 14, 2121).

[36] December 12 Order at 88–90.

71.     The NYPSC's variable rate ban followed its two-year investigation of ESCO practices that culminated in a ten-day evidentiary hearing to examine evidence submitted by 19 parties, and to hear the testimony and cross-examination of 22 witnesses and witness panels.[37]

72.     The NYPSC prefaced the variable rate ban with the observation that variable energy rates like those Defendant charged Plaintiff and the Class are "[t]he most commonly offered ESCO product" and that this popular product is frequently provided at "a higher price than charged by the utilities."[38]  The incongruity of consumers paying ESCOs more for the exact same energy offered by regulated utilities was not lost on the NYPSC:

> If market participants are unwilling, or unable, to provide material benefits to consumers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended. [39]

73.     In fact, the NYPSC found it "troubling" that even after considering reams of evidence "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified."[40]  This fact only highlighted the NYPSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices."[41]  Accordingly, and on this record, the NYPSC banned variable energy rates like those Defendant charged to Plaintiff and the Class.[42]  In place of these floating variable rates, the NYPSC required ESCOs to guarantee that

---

[37] *Id.* at 3–4.

[38] *Id.* at 11.

[39] *Id.* at 12.

[40] *Id.* at 30.

[41] *Id.* at 31.

[42] *Id.* at 39.

their variable rates would save customers money compared to what the utility would have charged.[43]  Under the new regulations, if the ESCO charges the consumer more than the utility, the consumer is owed a refund for the difference.[44]  In this litigation, the difference between what Major Energy charged consumers for the exact same energy Class Members' utilities would have charged is likely in the tens of millions of dollars.

74.     Moreover, the NYPSC's findings of widespread and unjustified overcharging underscores and highlights the importance and perniciousness of Defendant's material misrepresentations and omissions challenged in this lawsuit.  Likewise, the NYPSC's findings that ESCOs' overcharging is completely unjustified bolsters Plaintiff's claims that Defendant's variable rate pricing practices breached the duty of good faith and fair dealing.  Yet, there is more, as described below: not only are ESCOs using their variable rates to fleece consumers, but their practices also go undetected because it is virtually impossible for consumers to ferret out the fact that they are being overcharged.

75.     In its December 12 Order, the NYPSC faulted ESCOs for concealing critical pricing data from both ordinary consumers *and the NYPSC itself*: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[45]

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at 31.

76.     The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[46] and required that ESCO bills show how much the consumer's utility would have charged.[47]

77.     New York is not the only state using the overwhelming evidence of consumer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices.

78.     For example, a 2018 report commissioned by the Maryland Office of People's Counsel ("OPC") determined that Maryland households were ***annually*** "paying approximately $54.9 million *more* for electricity and gas than if they had purchased energy from their utilities."[48]

79.     Among the OPC's recommendations were the establishment of measures that would improve transparency regarding rates, terms, and conditions associated with residential consumers' purchase of electricity from ESCOs.[49]

80.     Similarly, on May 9, 2019, Commonwealth Magazine featured the Massachusetts Attorney General's findings that Massachusetts consumers who switched to ESCOs paid $177 million more over a two-year period than they would have if they had stayed with the local utility.[50]

---

[46] *Id.* at 33.

[47] *Id.* at 33–34.

[48] Susan M. Baldwin and Sarah M. Bosley, *Maryland's Residential Electric and Gas Supply Markets: Where Do We Go From Here?* (Nov. 2018) p. vi, *available at:* http://opc.maryland.gov/Portals/0/Publications/reports/APPRISE%20Where%20do%20we%20go%20from%20Here.pdf?ver=2019-09-11-075024-040 (last visited Jan. 14, 2121).

[49] *Id.* at 2.

[50] *Available at:* https://commonwealthmagazine.org/opinion/dpu-failing-to-protect-mass-consumers/.

81.     On August 27, 2019 Illinois Governor J.B. Pritzker signed the Home Energy Affordability & Transparency Act, which, effective January 1, 2020, requires *inter alia* ESCOs like Major Energy to include the utility's comparison price on all marketing materials, during telephone or door-to-door solicitations, and on every consumer's utility bill.  Ill. Public Act 101-0590.

82.     This class action, which seeks damages, restitution, penalties, and equitable relief is further proof that residential energy deregulation has thus far been an abject failure.  Major Energy exploited this lack of regulatory oversight by deceptively charging consumers exorbitant rates.  In fact, Major Energy's rates were substantially higher than the rates charged by other ESCOs and Plaintiff's local utility, Baltimore Gas and Electric ("BGE").

## II.     Plaintiff's Dealings with Major Energy

83.     In the Fall of 2013, Ms. Glikin signed up for electricity service with North Eastern States, Inc. d/b/a Entrust Energy (which is not a defendant in this action).  The rate was initially to be a fixed rate at 9.5¢ per kWh.

84.     Per the Agreement, Entrust Energy was to provide Ms. Glikin with written notification of her renewal terms at least 45 days prior to the renewal date, and if she did not respond to the notice, her service would automatically renew at a month-to-month variable rate plan.

85.     The Agreement described how the variable rate would be calculated as follows: "The rate per kWh may be adjusted monthly to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors."

86.     A utility's rates, like BGE's, serve as an ideal indicator of market conditions because these rates are based on the wholesale energy costs and the associated market costs that

are the same costs ESCOs, like Major Energy, incur.  While the utilities and Defendant might not

purchase energy and incur associated costs in precisely the same manner, over time the

wholesale costs they incur should be commensurate.  In fact, Defendant has a tactical advantage

over the utility as it can purchase energy from highly competitive markets for future use, and,

therefore, its costs for purchasing energy should at the very least reflect (if not undercut) market

prices, albeit over a longer term.  Therefore, while the utility's rates might not precisely match

Defendant's rates, they should correlate with the utility's rates and over time should be roughly

similar.  Instead, Major Energy's rates are wildly incongruent.

87.     On or around May 6, 2016, Ms. Glikin received a letter from NG&E, informing

Plaintiff that Entrust Energy had assigned Plaintiff's electricity supply contract to NG&E.  Ex. B.

88.     In March 2018, Ms. Glikin received another letter, this time from Major Energy,

informing her that NG&E had assigned her electricity supply contract to Defendant.  Ex. C.  The

letter did not disclose that NG&E and Major Energy are owned and operated by the same

individuals and entities.  *Id.*

89.     Major Energy's letter stated, "**NO ACTION REQUIRED**: Your service will

continue under your current service agreement without interruption."  *Id.* at 1 (emphasis in

original).

90.     The letter also advised that the Major Energy "team's experience in deregulated

energy markets enables them to offer *competitive* prices" and that Major Energy will "honor your

current agreement in place with National Gas & Electric and there will be no changes to the

terms or conditions through the life of your current contract."  (Emphasis added).  *Id.*

91.     The letter further stated that "[i]f you are currently served under a variable rate with National Gas & Electric, your service will continue under the same variable ELECTRIC rate." *Id.*

92.     Immediately after Ms. Glikin's contract was assigned to Major Energy in April 2018, Defendant began price gouging her.

93.     In January 2020, Ms. Glikin realized that her electricity rates were much higher than her local utility BGE's rates, and she canceled her service with Major Energy.

94.     Ms. Glikin's Agreement provided that the variable rate would reflect market conditions.  Major Energy pledged despite the assignment, it would abide by Ms. Glikin's existing contractual terms and provide "competitive" prices respectively, using its extensive electricity industry expertise.

95.     Any reasonable consumer would understand based on this language that Defendant's variable rate would, in fact, be competitive, and that it would reflect local wholesale and retail electricity market prices.

96.     Indeed, any reasonable consumer would understand that "competitive prices" are to be measured against the rate Defendant's competitors (*i.e.*, the local utility and other ESCOs) charge for the exact same energy.

97.     Notwithstanding the plain meaning of Defendant's representations, Major Energy's variable rates did not reflect wholesale prices and were not competitive.  Instead, its variable rates were substantially higher than both wholesale and retail market rates and did not decrease even when wholesale electricity market prices declined.

98.    The following table compares Ms. Glikin's electricity supply rates from Major Energy for the 21 billing periods spanning from April 2018 to January 2020 to her local utility BGE's contemporaneous supply rate:

| Provider | Service Period | Defendant's Rate per kWh | Utility's Rate per kWh | Percent Change |
|---|---|---|---|---|
| Major Energy | 4/20/18 - 5/14/18 | 18.98¢ | 8.06¢ | 135% |
| Major Energy | 5/14/18 - 6/14/18 | 16.11¢ | 7.64¢ | 111% |
| Major Energy | 6/14/18 - 7/16/18 | 18.99¢ | 7.64¢ | 149% |
| Major Energy | 7/16/18 - 8/14/18 | 18.98¢ | 7.64¢ | 148% |
| Major Energy | 8/14/18 - 9/13/18 | 18.98¢ | 7.64¢ | 148% |
| Major Energy | 9/13/18 - 10/12/18 | 18.99¢ | 8.07¢ | 135% |
| Major Energy | 10/12/18 - 11/12/18 | 18.98¢ | 8.07¢ | 135% |
| Major Energy | 11/12/18 - 12/13/18 | 18.98¢ | 8.07¢ | 135% |
| Major Energy | 12/13/18 - 1/14/19 | 18.98¢ | 8.07¢ | 135% |
| Major Energy | 1/14/19 - 2/13/19 | 18.99¢ | 8.14¢ | 133% |
| Major Energy | 2/13/19 - 3/14/19 | 18.99¢ | 8.14¢ | 133% |
| Major Energy | 3/14/19 - 4/12/19 | 18.99¢ | 8.14¢ | 133% |
| Major Energy | 4/12/19 - 5/13/19 | 18.99¢ | 8.14¢ | 133% |
| Major Energy | 5/13/19 - 6/14/19 | 18.98¢ | 6.69¢ | 184% |
| Major Energy | 6/14/19 - 7/16/19 | 18.99¢ | 6.69¢ | 184% |
| Major Energy | 7/16/19 - 8/14/19 | 18.99¢ | 6.55¢ | 190% |
| Major Energy | 8/14/19 - 9/13/19 | 18.99¢ | 6.55¢ | 190% |
| Major Energy | 9/13/19 - 10/14/19 | 18.99¢ | 7.18¢ | 164% |
| Major Energy | 10/14/19 - 11/13/19 | 18.99¢ | 7.18¢ | 164% |
| Major Energy | 11/13/19 - 12/14/19 | 18.98¢ | 7.18¢ | 164% |
| Major Energy | 12/14/19 - 1/15/20 | 18.99¢ | 7.29¢ | 160% |

99.    The "Percent Change" column demonstrates the drastic difference between the Major Energy's rates and BGE's contemporaneous rates.  The difference between the rates exceeded 100% for 21 of the 21 months—meaning that Major Energy's variable rates were more than double the utility's rates.  On average, Major Energy's rates were 151% higher than the utility's rate.

100.    At no time could Major Energy's rate have been described as "competitive" with the utility rate.

101.    Moreover, BGE's supply rate, charged to those customers who do not select an ESCO, reflects market prices.  As BGE explains, "[c]ustomers who do not choose an alternate energy supplier for their electric requirements will be placed on Market-Priced Service."[51]  As explained above, BGE is Major Energy's primary competitor in the Plaintiff's service territory, and BGE's rates encompass the average wholesale price of electricity and associated costs over time without any markup, making it an ideal comparator.

102.    The disconnect between BGE's rates and Major Energy's rates further demonstrates that Major Energy's rates did not reflect market costs to purchase electricity, as promised in Ms. Glikin's customer agreement.  This is because Major Energy's variable rates failed to fluctuate in accordance with changes in BGE's (*i.e.*, its primary competitor's) rate.  For example, between May and August 2019, BGE's rates gradually declined from 8.14¢ to 6.55¢ per kWh (a decrease of 19.5%), while Defendant's variable rate declined *one one-hundredth* of a penny from 18.99¢ to 18.98¢ per kWh (or a decrease of 0.053%) and immediately increased back to 18.99¢ per kWh.  Similarly, when BGE's rate remained constant at 7.64¢ per kWh between June and July 2018, Major Energy increased its variable rate—which was already more than double BGE's rate—from 16.11¢ to 18.99¢ per kWh (increasing 18%).

103.    Not only is Plaintiff's local utility Major Energy's primary competitor (as the utility always is), but BGE's rates are also the best indicator of market prices.  BGE's rates are based on the PJM market competitive short-term public market (also known as "real-time" pricing or the "spot market") for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as Major

---

[51] BGE.com, www.bge.com/MyAccount/MyBillUsage/Documents/Electric/Rdr_1.pdf (last visited Jan. 14, 2121)

Energy incur) and are set without any markups or profit.  In other words, BGE purchases wholesale electricity for its customers every day on an open free market; Major Energy could do the same.  Consequently, BGE's electricity rates are the ideal comparator here because they are Major Energy's primary competitor's rates and represent wholesale market prices for electricity and associated costs.

104.     Changes in wholesale costs caused BGE's rates to decline during the same period that Major Energy's rates remained exceptionally high, even though Defendant should have been able to procure electricity at a lower cost than the utility given its tactical advantage over BGE. As explained above, Major Energy can purchase electricity from any number of markets using a variety of purchasing and hedging strategies.  Its cost for purchasing electricity, therefore, should have at least reflected, if not undercut, BGE's prices.

105.     Indeed, given Defendant's self-description as a sophisticated, skilled purchaser of electricity, touting that its executives had "decades of retail energy supply and utility experience" that it would use to offer "competitive prices," it is most likely that Major Energy was able to and did purchase wholesale electricity at the same or lower cost than the utility, at least over time.  If Major Energy did not have such expertise, it deceived its newly acquired customers to their direct detriment.  Put another way, either Major Energy misled its customers about its expert ability to provide competitive rates (causing injury to customers who paid a high variable rate as a result), or it misled them when it promised to provide competitive rates.

106.     Any reasonable customer would expect and understand that an offer of "competitive prices" would be competitive with the default supply rates BGE charged, particularly since BGE is the primary competitor and consumers are accustomed to receiving their residential energy from their local utility.

107.    Major Energy also did not adequately disclose to Plaintiff that its variable electricity rates are consistently and significantly higher than the rates BGE charges.  Major Energy likewise failed to adequately disclose to Plaintiff that in paying Defendant's variable energy rates, she was receiving no added material benefit at a dramatically higher price than if she had bought her energy from BGE.

108.    Major Energy also did not provide Plaintiff with adequate advance notice of the variable rates it would charge, nor did it adequately disclose the variable rate methodology it used to calculate its variable rates or the conditions that must be present for a variable rate customer like Plaintiff to save money compared to what the consumer's local utility would have charged.

109.    But for Defendant's material representations and omissions, Plaintiff would never taken energy service from Defendant.

110.    Major Energy's variable rate also was consistently substantially higher than other electricity rates available in the market, including its own fixed rates and introductory rates.  For example, as of the filing of this action Major Energy offers new customers in BGE's electricity territory 6- or 12-month fixed rate plans at 7.09¢ per kWh, while it charges variable rate customers in the exact same territory more than 18¢ per kWh for the ***exact*** same energy.

111.    The only reason Major Energy charges its fixed rate customers a rate that is less than half of what it charges customers who have rolled over into a variable rate after a fixed rate period expires is that Major Energy has to disclose to its customers what the actual fixed rate is. In contrast, Major Energy never discloses to its customers in advance what the variable rate is, that it is substantially higher than its fixed rates or utility rates or that it makes a substantially higher margin on its variable rate customers versus its fixed rate customers; or the actual

methodology Major Energy uses to calculate its variable rates; or the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged.

112.    Because Major Energy can purchase wholesale energy in a competitive marketplace using sophisticated financial transactions, there is no material difference between the costs Major Energy incurs for its fixed rate customers and those it incurs for its variable rate customers, and certainly not a difference that justifies charging variable rate customers more than double what fixed rate customers pay.  Indeed, Major Energy faces a greater risk to serve its fixed rate customers because it is obligated to serve those customers at the same rate no matter how high or low wholesale costs are, whereas Major Energy can pass along any such cost increases to its variable rate customers.  Simply put, Major Energy's variable rates are merely an excessive and unlawful exploitation of the information asymmetry between Major Energy and the consuming public.

113.    The same egregious disparities exist when comparing Major Energy's Maryland variable rates to competing Maryland ESCOs' rates.  For example, in 2018, Major Energy's electricity supply rates were higher than the ten largest Maryland ESCOs' electricity supply rates (as measured by total volume of electricity sold). [52]  These other ESCOs are Major Energy's main competitors excluding its primary competitor, the local utility.  Yet Defendant's average 2018 supply rates were more than 50% higher than the average of the rates charged by the ten largest Maryland ESCOs during the same time period.[53]

---

[52] *See 2018 Retail Power Marketers Sales — Residential*, U.S. Energy Information Administration ("EIA"), *available at:* https://www.eia.gov/electricity/sales_revenue_price/pdf/table12.pdf (last visited Jan. 14, 2121).

[53] *Id.*

114.    Collectively, the top ten Maryland ESCOs sales constituted 75% of ESCOs' electricity sales in Maryland.[54]  Yet the average variable rate Major Energy charged Plaintiff in 2018 (18.57¢ per kWh) was 90.42% higher than the average rate among Major Energy's primary ESCO competitors in 2018 (excluding the local utilities).  Indeed, this rate was higher than the average rate of retail electricity in Maryland every single year for the 17-year period from 2002 to 2019.[55]

115.    Of the 54 ESCOs that served Maryland consumers in 2018, Major Energy's rates were the second highest.[56]

116.    Notably, the EIA data provides each ESCO's average rate for the year, meaning that the rate for each ESCO includes both fixed and variable rates.  Because Major Energy's fixed rates are on average far less than half of its variable rates, it necessarily follows that Major Energy's variable rates are much higher than other ESCOs' rates.  Additionally, there is no reason to conclude that a reasonable consumer would understand that the retail component of "wholesale market conditions" is limited to just other ESCOs' variable rates.  To the contrary, a reasonable consumer would understand that phrase to encompass all of the retail choices consumers have in the competitive energy market, which includes fixed and variable rate offerings.

117.    Major Energy's ESCO competitors in Maryland also incur the same costs as Major Energy and their rates likewise include a profit margin.  Major Energy's energy is no different from its competitors' energy; it simply supplies the same energy as every other

---

[54] *Id.*

[55] U.S. Energy Information Administration (www.eia.gov), Electricity Data Browser: "Average retail price of electricity" for "Maryland," "Residential."  Last visited Jan. 14, 2121.

[56] *See 2018 Retail Power Marketers Sales* Table 12.

supplier.  There is therefore no basis for Major Energy's rates to be consistently significantly

higher than those of other ESCOs except for Major Energy's deceptive practices and avarice.

118.    A reasonable consumer understands and expects that variable electricity rates

based on "market conditions, including market pricing of commodity, transportation, profit, and

other market price factors" reflect the wholesale price for electricity, that is, the market price

available to Major Energy for the electricity it in turn supplies to its retail customers.

119.    However, Major Energy's variable rate rarely reflects or varies with wholesale

market prices in Maryland, which would be the PJM market prices.[57]

120.    The following table identifies the billing periods during which Ms. Glikin was

charged a variable rate for her electricity, Defendant's variable rates for each billing period, and

the contemporaneous wholesale market price for electricity available in the PJM area ("Market

Supply Costs").

121.    The Market Supply Costs below are based on the costs that an ESCO incurs

supplying a residential customer for each billing period.  The Market Supply Costs include the

load-weighted day-ahead PJM prices in Ms. Glikin's utility zone, ancillary services costs,

capacity costs, and various relatively-small charges related to PJM and the utility.  The load

profile, capacity and transmission obligation, and price data used to calculate these charges are

obtained from public sources including reports and data postings by PJM, Monitoring Analytics

(PJM's Federal Energy Regulatory Commission–approved external market monitor), BGE, and

the Maryland Public Service Commission.  Major Energy was and is capable of purchasing

---

[57] PJM (or PJM Interconnection) is a neutral, independent party that operate a competitive wholesale
electricity market in Maryland and other states in the Northeast.

electricity at wholesale at these prices, and given its touted vast experience, it likely purchased

wholesale electricity at lower costs.

| Provider | Service Period | Defendant's Rates per kWh | Market Supply Cost per kWh | Percent Change |
|---|---|---|---|---|
| Major Energy | 4/20/18 - 5/14/18 | 18.98¢ | 8.863¢ | 114% |
| Major Energy | 5/14/18 - 6/14/18 | 16.11¢ | 8.071¢ | 100% |
| Major Energy | 6/14/18 - 7/16/18 | 18.99¢ | 6.795¢ | 179% |
| Major Energy | 7/16/18 - 8/14/18 | 18.98¢ | 6.897¢ | 175% |
| Major Energy | 8/14/18 - 9/13/18 | 18.98¢ | 7.699¢ | 147% |
| Major Energy | 9/13/18 - 10/12/18 | 18.99¢ | 7.777¢ | 144% |
| Major Energy | 10/12/18 - 11/12/18 | 18.98¢ | 8.534¢ | 122% |
| Major Energy | 11/12/18 - 12/13/18 | 18.98¢ | 8.194¢ | 132% |
| Major Energy | 12/13/18 - 1/14/19 | 18.98¢ | 6.926¢ | 174% |
| Major Energy | 1/14/19 - 2/13/19 | 18.99¢ | 7.565¢ | 151% |
| Major Energy | 2/13/19 - 3/14/19 | 18.99¢ | 7.495¢ | 153% |
| Major Energy | 3/14/19 - 4/12/19 | 18.99¢ | 8.105¢ | 134% |
| Major Energy | 4/12/19 - 5/13/19 | 18.99¢ | 8.24¢ | 130% |
| Major Energy | 5/13/19 - 6/14/19 | 18.98¢ | 6.475¢ | 193% |
| Major Energy | 6/14/19 - 7/16/19 | 18.99¢ | 5.421¢ | 250% |
| Major Energy | 7/16/19 - 8/14/19 | 18.99¢ | 5.432¢ | 250% |
| Major Energy | 8/14/19 - 9/13/19 | 18.99¢ | 5.478¢ | 247% |
| Major Energy | 9/13/19 - 10/14/19 | 18.99¢ | 6.445¢ | 195% |
| Major Energy | 10/14/19 - 11/13/19 | 18.99¢ | 6.985¢ | 172% |
| Major Energy | 11/13/19 - 12/14/19 | 18.98¢ | 6.148¢ | 209% |
| Major Energy | 12/14/19 - 1/15/20 | 18.99¢ | 5.534¢ | 243% |

122.    The discrepancy between changes in wholesale prices and Major Energy's

variable rate demonstrates that Major Energy's rates do not reflect changes in market conditions.

For example, from April to June 2019, the wholesale cost of electricity steadily declined from

8.24¢ to 5.421¢ per kWh, a decrease of more than 32%.  During the same period, Major

Energy's rate remained constant at 18.99¢ per kWh.  Similarly, between June and July 2018,

wholesale costs declined from 8.071¢ to 6.795¢ per kWh (decreasing 16%), while Major

Energy's rate increased from 16.11¢ to 18.99¢ per kWh (increasing 18%).  These pricing

discrepancies continued through the end of Ms. Glikin's tenure on Major Energy's variable rate.

While wholesale electricity prices declined from 6.985¢ to 5.534¢ per kWh between November 2019 and January 2020, a 21% decrease, Major Energy's rate temporarily dipped from 18.99¢ to 18.98¢ and increased back to 18.99¢ per kWh—*i.e.*, 243% higher than the wholesale price.

123.   No reasonable customer, including Ms. Glikin, would expect that Major Energy could interpret contract language requiring that rates that "reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors" to mean that the ESCO would artificially inflate its rates beyond any resemblance to wholesale costs or competitors' rates.  Indeed, the fact that Major Energy's rates were ***always*** more than double, and often more than triple, wholesale market prices demonstrates the extent of its unscrupulous price gouging.

124.   No reasonable consumer would understand or expect that a rate that was supposed to reflect market conditions would be more than twice as high as the area's wholesale market prices.

125.   Major Energy knew that its variable rates did not reflect market conditions, as Ms. Glikin contracted for.   Indeed, the exorbitant variable rates that Major Energy charged Ms. Glikin remained virtually unchanged, even though the wholesale market rate at the time fluctuated between 5.421¢ and 8.863¢ per kWh during the same 21-month period.

126.   Defendant's statements regarding its electricity rates were materially misleading because the most important consideration for any consumer choosing an energy supplier is price; electricity and gas are fungible commodities.

127.   Moreover, Defendant at no time alerted or informed Ms. Glikin that the cost for electricity would be *significantly* higher than the same electricity sold by BGE, her utility company.

128.    No reasonable consumer who knew the truth about Major Energy's exorbitant rates would have chosen it as an electricity supplier or would have agreed that "No Action [was] Required," as Major Energy falsely claimed to lull Ms. Glikin to stay with Major Energy.  When Plaintiff received this representation, she could have changed her service back to the utility rather than allowing service to transfer to Major Energy.

129.    Crucially, instead of informing its customers of its actual variable rate methodology and rates per kWh, Major Energy affirmatively deceived consumers by promising to provide "competitive" rates while implementing a pricing methodology focused on profit maximization.  Defendant knowingly and intentionally misrepresented and ignored the Agreement's pricing description—and its legal obligations—and instead it engaged in rampant profiteering and price gouging.

130.    Other than potential price savings, there is nothing to materially differentiate Major Energy from other ESCOs or the local utility, and the potential for price savings is the *only* reason any reasonable consumer would become a Major Energy customer.  In fact, Major Energy's (and its parent Spark Energy) long history of deceptive promises of savings demonstrate that Defendant and its senior management know that the potential for savings is why consumers switch to ESCOs.

131.    Major Energy induced consumers into purchasing its energy supply via material omissions and intentionally misrepresenting its energy rates as being "competitive" when it knew that its rates were unconscionably high and bore no resemblance to market conditions. Defendant did so in order to reap outrageous profits at the expense of unsuspecting consumers. Defendant acted with actual malice, or wanton and willful disregard for consumers' well-being.

132.    It is well-established that defaults are powerful drivers of consumer

behavior.  There are various factors underlying this human tendency that have been discussed in

the judgment and decision-making literature, such as the work about defaults and the "status quo

bias,"[58] and "Nudges."[59]

133.    In this case, Major Energy knew that once it had acquired the consumer's energy

account, it could charge high energy rates and many consumers (if not most) would not know,

and simply pay the exorbitant charges, month after month.

134.    Defendant's cynical exploitation of consumer inertia is further exacerbated by the

fact that it is unlikely that consumers will compare Major Energy's prices with what their local

utility is charging, or that that they will understand the differences in the two companies' charges

so as to make the comparison effective.  As the NYPSC has observed, "it is extremely difficult

for mass market retail energy customers to access pricing information relevant to their decision

to commence, continue or terminate service through an ESCO."[60]

135.    Further, there are extended periods of time when the wholesale market price of

electricity declined or remained steady, yet Major Energy's prices remained consistently high.

But Major Energy does not disclose this material fact to its prospective or current customers.[61]

---

[58] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[59] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

[60] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 11 (Feb. 25, 2014).

[61] The wholesale cost of energy is the most significant and potentially volatile component of electricity that ESCOs, like Major Energy, incur.  Costs associated with transmission or transportation costs or other similarly static market and business price-related factors do not account for the extent to which Major Energy's prices are disassociated from changes in wholesale prices.

136.    No reasonable consumer exposed to Major Energy's material misrepresentations and omissions would expect that Major Energy would charge them more than the utility by so much money for so long.

137.    The rates Major Energy actually charged in comparison to the utility rate demonstrates the deceptive nature of its communications to customers upon the assignment of customers' contracts to Major Energy.

138.    Thus, Major Energy's omissions and representations with respect to the rates it will charge are materially misleading.

139.    No reasonable consumer who knows the truth about Major Energy's exorbitant rates would choose Defendant as their energy supplier.

140.    The wholesale cost of energy is the primary component of the non-overhead "market conditions" Major Energy incurs.

141.    Major Energy's expansion of the term "market" conditions to include "market pricing of commodity, transportation, profit, and other market price factors" as the basis for setting rates also does not explain Major Energy's price gouging.

142.    A reasonable consumer might understand that an ESCO will attempt to make a reasonable margin on the commodity it sells to consumers.  However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers in the market, and also that Major Energy's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead consistently outrageously higher.  That other ESCOs' rates are lower, even though they also purchase energy from the wholesale market, demonstrates that Major Energy sets its profit margins in bad faith. Similarly, the utility's rate reflects a rate that Major Energy could charge (because Major Energy

could purchase energy in the same way and at the same cost as the utility) plus a reasonable margin. No reasonable consumer would consider a margin (the difference between Major's procurement costs and the rate charge to consumers) that is 100% to 243% to be fair or commercially reasonable.

143. All potentially conceivable factors within what could be construed as "market conditions" are insignificant in terms of the overall costs Major Energy incurs to provide its energy, and they do not fluctuate over time. Therefore, these other cost factors cannot explain the drastic and sustained increase in Major Energy's variable rate or the reason its rates are completely disconnected from changes in wholesale costs.

144. Thus, Major Energy's energy supply pricing does not comport with its customer contract's requirement that variable prices "reflect market conditions." Instead, consumers are charged rates that are substantially higher than those of competitors, especially Major Energy's main competitor—the utility—and untethered from the factors specified in the contract.

145. There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Major Energy charges its fixed rate customers. Because Major Energy is a sophisticated energy company, it can predict with reasonable accuracy the energy needs of its variable rate customers, and because it can use various sophisticated strategies to purchase energy for its variable rate customers, its costs for serving variable rate customers and fixed rate customers are not substantially different. The only reason that Major Energy's variable rates are so much higher than its fixed rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices.

## RULE 9(B) ALLEGATIONS

146.    To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

147.    WHO:

- Major Energy, acting through its corporate personnel, makes material misrepresentations and omissions of fact in the marketing, advertising, promotion, and sale of energy.

148.    WHAT:

- Major Energy makes material omissions by failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges.

- Major Energy makes material omissions by failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added material benefit at a dramatically higher price than if the consumer were to stay with the local utility.

- Major Energy makes material omissions by failing to provide customers adequate advance notice of the variable rates it would charge.

- Major Energy makes material omissions by failing to adequately disclose the variable rate methodology it used to calculate its variable rates to enable consumers to potentially compare prices.

- Major Energy makes material omissions by failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

- Major Energy makes material omissions by failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Major Energy incurs for its fixed rate customers and those it incurs for its variable rate customers.

- Major Energy makes material misrepresentations by marketing, advertising, promoting, and selling its variable rate as corresponding closely to market pricing when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."

- Major Energy makes material misrepresentations by marketing, advertising, promoting, and selling its variable rate as saving consumers money compared to their local utilities or other ESCOs when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."

- The language that Major Energy uses in its letters to consumers falsely and deceptively creates the impression that its variable rate would be based on wholesale costs of energy and competitors' rates.  Major

Energy makes these misrepresentations and omissions with respect to its variable rate even though it knows that its variable rate will not be based on market conditions as the variable rate does not reflect wholesale prices or its competitors' rates.  Major Energy fails to inform customers that there are undisclosed factors driving its variable rate pricing methodology that are not prevailing market prices as any reasonable consumer would understand that term to mean.

- Indeed, Major Energy knows its representation that the variable rate is competitive and based on prevailing market prices is false because Major Energy does not meaningfully consider wholesale prices, or the rates charged by utilities or other ESCOs when it sets the variable rate. No reasonable consumer exposed to Major Energy's representations would expect that there would be no connection between market prices and Major Energy's variable rates.

149.   WHERE:

- Major Energy makes its material misrepresentations and omissions in its standard letter to consumers which was received by Plaintiff and upon which Major Energy intended Plaintiff to rely.

150.   WHEN:

- Major Energy made the material misrepresentations and omissions when it provided Plaintiff with its March 14, 2018 deceptive letter. Major Energy makes the same or substantially similar

misrepresentations and omissions of material facts to all of its

customers.

151.   WHY:

- Knowing that price is the most fundamental factor in choosing an

  energy supplier, Major Energy made these material misrepresentations

  and omissions regarding its variable rate with the purpose of inducing

  Plaintiff and other consumers to purchase its variable rate energy.  As a

  direct result of its material misrepresentations and omissions, Major

  Energy has successfully reaped millions in profits at the expense of its

  unsuspecting customers.

152.   HOW:

- Major Energy makes material misrepresentations and fails to disclose

  material facts concerning its variable rate when marketing, advertising,

  promoting, and selling its energy services by representing that its

  variable rate is a competitively priced rate.  In reality, Major Energy

  does not price its variable rate competitively with either the local

  utilities or competing ESCOs, and there is no correlation between

  Major Energy's variable rate and market conditions.  Instead, Major

  Energy's rate is consistently higher than that of its primary competitor

  (the local utility), as well as rates charged by other ESCOs, and is

  invariably higher than its fixed rates.  Major Energy further fails to

  disclose that it artificially inflates its variable rates in order to maximize

  its own profits, in flagrant disregard of its representations to consumers.

Major Energy also obscures the reality of its variable rate pricing methodology and exploits the dramatic information asymmetries between Major Energy and its customers.

## CLASS ACTION ALLEGATIONS

153.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing tactics—and this case is about the responsibility of Defendant, at law and in equity, for its knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class Members in its degree of care or candor, its actions or inactions, or in the content of its statements or omissions.  On information and belief, the variable rate provisions in the customer agreements for all of Major Energy's customers, whether legacy customers obtained from another ESCO or customers who were enrolled by Major Energy, are materially the same.  The objective facts on these subjects are the same for all Class Members.

154.    Plaintiff sues on her own behalf and on behalf of a Class for monetary and equitable relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

155.    The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

  a.  The Multistate Class, preliminarily defined as all Major Energy customers (including customers of companies Major Energy acts as a successor to) in the United States charged a variable rate for electricity or gas by Major Energy during the applicable statute of limitations period up to and including the date of judgment.

  b.  The State Classes, preliminarily defined as all Major Energy customers in the state of [*e.g.*, New York, Maryland, etc.] (including customers of companies Major Energy acts as a successor to) who were charged a variable rate for electricity or gas by Major Energy during the applicable statute of limitations period up to and including the date of judgment.

156.     Excluded from the Class are: Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

157.     Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiff files her motion for class certification.

158.     Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of Major Energy.  Plaintiff believes, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses tens of thousands of individuals whose identities can be readily ascertained from Defendant's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

159.     The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

160.     Plaintiff is an adequate class representative.  Her claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the Defendant.  Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

161.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent her interests and those of the Class.

162.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

    a.   Whether Defendant's representations and/or omissions are fraudulent;

    b.   Whether Defendant's conduct violates various state consumer protection statutes;

    c.   Whether Defendant was unjustly enriched as a result of its conduct;

    d.   Whether Defendant breached its customer contracts and violated the duty of good faith and fair dealing;

    e.   Whether Class Members have been injured by Defendant's conduct;

    f.   Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

    g.   The extent of class-wide injury and the measure of damages for those injuries.

163.     A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct; iii) Defendant has acted or refused to act on grounds generally applicable to all Class Members;

and iv) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

164.    Further, the following issues are also appropriately resolved on a class-wide basis under FED. R. CIV. P.  23(c)(4):

    a.   Whether Defendant's representations and/or omissions are fraudulent;

    b.   Whether Defendant's conduct violates various state consumer protection statutes;

    c.   Whether Defendant was unjustly enriched as a result of its conduct;

    d.   Whether Defendant breached its customer contracts and violated the duty of good faith and fair dealing;

    e.   Whether Class Members have been injured by Defendant's conduct; and

    f.   Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices.

165.    Accordingly, this action satisfies the requirements set forth under FED. R. CIV. P. 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

## COUNT I

## BREACH OF CONTRACT

## (ON BEHALF OF A MULTISTATE CLASS, OR ALTERNATIVELY, ON BEHALF OF EACH OF THE INDIVIDUAL STATE CLASSES)

166.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

167.    Plaintiff and the Class were bound by valid contracts with Defendant for the provision of energy supply.

168.    Pursuant to those contracts, Defendant was required to charge a variable rate

reflective of market conditions, *i.e.*, a rate competitive with local wholesale and competing retail energy rates.  Specifically, the Agreement specifies that Defendant's variable rates would be "adjusted monthly to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors."

169.    Pursuant to those contracts, Plaintiff and all Class Members agreed to pay Defendant's rate and did so.

170.    However, Defendant failed to perform its obligations under the contract, because its rates did not reflect market conditions and were not competitive.

171.    Plaintiff and all Class Members were damaged as a result because they were billed and they paid energy charges that were higher than Defendant was authorized to charge under the contract's terms.

172.    As a result of Defendant's breaches, Major Energy is liable to Plaintiff and members of the Class for damages and attorney's fees and expenses.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (ON BEHALF OF A MULTISTATE CLASS, OR ALTERNATIVELY, ON BEHALF OF EACH OF THE INDIVIDUAL STATE CLASSES)

173.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

174.    Plaintiff and the Class were bound by valid contracts with Defendant for the provision of energy supply.

175.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

176.     Under the contract, to the extent Defendant had discretion to set the variable rate for energy based on energy market pricing, it was obligated to exercise its discretion in good faith.

177.     Plaintiff reasonably expected that the variable energy rates would, notwithstanding Defendant's profit goals, reflect the wholesale and retail market prices for energy and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy energy from Defendant.

178.     Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations that Defendant's variable energy rate would be commensurate with market conditions.

179.     As a result of Defendant's breaches, Major Energy is liable to Plaintiff and members of the Class for damages and attorney's fees and expenses.

## COUNT III

## NEW YORK GENERAL BUSINESS LAW § 349

## (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW)

180.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

181.     Plaintiff brings this claim under N.Y. GEN. BUS. LAW § 349 on her own behalf and on behalf of each member of the Class.

182.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. GEN. BUS. LAW § 349.

183.   Defendant's marketing and billing practices are consumer-oriented in that they are directed at members of the consuming public.

184.   Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW § 349 including:

    a.   Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

    b.   Failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the consumer were to stay with the local utility;

    c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

    d.   Failing to adequately disclose the variable rate methodology Major Energy used to calculate its variable rates to enable consumers to potentially compare prices;

    e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

    f.   Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Major Energy incurs for its fixed rate customers and those its incurs for its variable rate customers;

    g.   Falsely representing that customers who elect to purchase Defendant's variable rate energy will save money compared to their local utilities or other ESCOs when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."; and

    h.   Falsely representing that its variable rates correspond closely to market pricing when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."

185.    The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

186.    As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action.

187.    Plaintiff and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW § 349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the Class all amounts wrongfully assessed and/or collected.

188.    As a result of Defendant's unfair and deceptive practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs and reasonable attorneys' fees and all other relief available under N.Y. GEN. BUS. LAW § 349.

## COUNT IV

### NEW YORK GENERAL BUSINESS LAW § 349-D

### (ON BEHALF OF A MULTISTATE CLASS UNDER NEW YORK LAW)

189.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

190.    Plaintiff brings this claim under N.Y. GEN. BUS. LAW § 349 on her own behalf and on behalf of each member of the Class.

191.    N.Y. GEN. BUS. LAW § 349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or

practices in the marketing of energy services."

192. Defendant offers for sale energy services for and on behalf of an ESCO.

193. Defendant has engaged in, and continues to engage in, deceptive acts and practices

in violation of N.Y. GEN. BUS. LAW § 349-d(3) including:

a. Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

b. Failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the consumer were to stay with the local utility;

c. Failing to provide customers adequate advance notice of the variable rates it would charge;

d. Failing to adequately disclose the variable rate methodology Major Energy used to calculate its variable rates to enable consumers to potentially compare prices;

e. Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

f. Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Major Energy incurs for its fixed rate customers and those its incurs for its variable rate customers;

g. Falsely representing that customers who elect to purchase Defendant's variable rate energy will save money compared to their local utilities or other ESCOs when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."; and

h. Falsely representing that its variable rates correspond closely to market pricing when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."

194.    The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

195.    As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action.

196.    Plaintiff and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW § 349-d(10), this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the Class all amounts wrongfully assessed and/or collected.

197.    As a result of Defendant's unfair and deceptive practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs and reasonable attorneys' fees and all other relief available under N.Y. GEN. BUS. LAW § 349-d, including $500 for each violation, such damages to be trebled.

## COUNT V

### UNFAIR AND DECEPTIVE ACTS AND PRACTICES

**(ON BEHALF OF A MULTISTATE CLASS UNDER THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS, OR, ALTERNATIVELY, ON BEHALF OF EACH OF THE INDIVIDUAL STATE CLASSES)**

198.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

199.    As described above, Plaintiff and the Class have suffered ascertainable losses of money and have otherwise been harmed as a result of Defendant's unfair and deceptive practices, including:

a.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

b.  Failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the consumer were to stay with the local utility;

c.  Failing to provide customers adequate advance notice of the variable rates it would charge;

d.  Failing to adequately disclose the variable rate methodology Major Energy used to calculate its variable rates to enable consumers to potentially compare prices;

e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

f.  Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Major Energy incurs for its fixed rate customers and those its incurs for its variable rate customers;

g.  Falsely representing that customers who elect to purchase Defendant's variable rate energy will save money compared to their local utilities or other ESCOs when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."; and

h.  Falsely representing that its variable rates correspond closely to market pricing when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."

200.    The aforementioned acts are willful, unfair, unconscionable, deceptive, and contrary to the public policies of Connecticut, Illinois, Massachusetts, Ohio, Washington DC,

New Jersey and Pennsylvania, and any other state where Defendant sells variable rate energy, all of which aim to protect consumers.

201.    Plaintiff and the members of each State Class are entitled to recover damages, and all other available relief for Defendant's unfair and deceptive practices under the laws of their states of residence:[62] Illinois—815 ILL. COMP. STAT. § 505/1, *et seq.*; Massachusetts—MASS. GEN. LAWS CH. 93A, § 1 *et seq.*; New Jersey—N.J. STAT. ANN. § 56:8-1, *et seq.*; Ohio— OHIO REV. CODE § 1345.02 *et seq.*; Pennsylvania— 73 P.S. §201-1, *et seq.*; Washington D.C.—CODE OF D.C. § 28-3904, *et seq.*; and Connecticut— CONNECTICUT GEN. STAT. § 42-110a, *et seq.*

202.    Based on information and belief, Major Energy does not maintain a place of business or keep assets in Massachusetts.  Notwithstanding, on December 12, 2020, Plaintiff mailed a letter to Defendant in compliance with MASS. GEN. LAWS CH. 93A, § 9(3).  Plaintiff also effectuated service of the same letter upon Defendant on December 14, 2020.  Because Plaintiff did not receive a full and satisfactory response to her letter within 30 days, she hereby claims relief under MASS. GEN. LAWS CH. 93A, § 1 *et seq.* and seeks all damages and relief to which the Massachusetts Class is entitled.

203.    Following the filing of this Complaint, Plaintiff will send a copy to the Attorney General of Connecticut and the Commissioner of Consumer Protection in compliance with CONNECTICUT GEN. STAT. § 42-110g.

204.    Following the filing of this Complaint, Plaintiff will send a copy to the Attorney General of New Jersey within ten (10) days of its filing setting forth claims under the New Jersey Consumer Fraud Act.

---

[62] There is no material conflict between Maryland or New York's consumer fraud law and the state statutes listed here.

## COUNT VI

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### MD. CODE, COM. LAW § 13-101 *ET SEQ.* ("MCPA")

### (ON BEHALF OF THE MARYLAND CLASS)

205.    Plaintiff re-alleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

206.    The MCPA forbids "unfair or deceptive trade practice."  MD. CODE, COM. LAW §

13-303 *et seq*.

207.    The MCPA defines unfair and deceptive practices to include, (i) a "[f]alse … or

misleading oral or written statement, visual description, or other representation of any kind

which has the capacity, tendency, or effect of deceiving or misleading consumers" (ii)

representation that "consumer services . . . have a . . . characteristic . . . benefit . . . which they do

not have"; (iii) a "[f]ailure to state a material fact if the failure deceives or tends to deceive," and

(iv) a "misrepresentation, or knowing concealment . . .  or omission of any material fact with the

intent that a consumer rely on the same in connection with . . . the sale of any . . . consumer

service. "  MD. CODE, COM. LAW § 13-301.

208.    Defendant's affirmative misrepresentations and omissions alleged above

constitute the requisite "unfair or deceptive acts or practices" to support a violation of the

MCPA.

209.    Defendant has engaged in, and continues to engage in, deceptive acts and practices

in violation including:

      a.    Failing to adequately disclose that Defendant's variable energy rates
          are consistently and significantly higher than the rates a customer's
          existing utility charges;

      b.    Failing to adequately disclose that consumers paying Defendant's
          variable energy rates receive no material added benefit at a

dramatically higher price than if the consumer were to stay with the local utility;

c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

d.   Failing to adequately disclose the variable rate methodology Major Energy used to calculate its variable rates to enable consumers to potentially compare prices;

e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

f.   Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Major Energy incurs for its fixed rate customers and those its incurs for its variable rate customers;

g.   Falsely representing that customers who elect to purchase Defendant's variable rate energy will save money compared to their local utilities or other ESCOs when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."; and

h.   Falsely representing that its variable rates correspond closely to market pricing when it represented to consumers that "[t]he Major Energy team's experience in deregulated energy markets enables them to offer competitive prices. . . ."

210.   As a result of Defendant's unfair and deceptive practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs and reasonable attorneys' fees and all other relief available under the MCPA.

## COUNT VII

### FRAUD BY CONCEALMENT

### (ON BEHALF OF A MULTISTATE CLASS UNDER THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS, OR, ALTERNATIVELY, ON BEHALF OF EACH OF THE INDIVIDUAL STATE CLASSES)

211.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212.   Plaintiff brings this claim on her own behalf and on behalf of each member of the Multistate Class under the laws of the states where Defendant sold variable rate energy, and on behalf of each member of the individual State Classes under the laws of those States.

213.   Defendant concealed material facts concerning its variable energy rates including:

    a.   Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

    b.   Failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the consumer were to stay with the local utility;

    c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

    d.   Failing to adequately disclose the variable rate methodology Major Energy used to calculate its variable rates to enable consumers to potentially compare prices;

    e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

    f.   Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Major Energy incurs for its fixed rate customers and those its incurs for its variable rate customers.

214.    Defendant sold Plaintiff energy without adequately disclosing these material facts.

215.    Defendant's material omissions were intentional and were committed to protect Defendant's profits, avoid damage to Defendant's image, and to save Defendant money; and Defendant did so at Plaintiff's expense.

216.    The information Defendant concealed was material.

217.    Defendant had a duty to disclose the material information it concealed because this information was known and accessible only to Defendant; Defendant had superior knowledge and access to the facts, and Defendant knew the facts were not known to, or reasonably discoverable by Plaintiff and the Class.  Defendant also had a duty to disclose because Major Energy made affirmative misrepresentations about its energy rates, which were misleading, deceptive, and incomplete without disclosure of the withheld material information.

218.    Plaintiff was unaware of these omitted material facts and would not have become or remained Defendant's customer if she had known these concealed and/or suppressed facts; and/or would not have continued to be Defendant's customer for as long as she had been. Plaintiff's actions were justified.

219.    In deciding to become and remain Defendant's customers, Plaintiff and the Class reasonably relied on Defendant's omissions.

220.    Defendant's fraud by concealment caused damage to Plaintiff and the Class, who are entitled to damages and other legal and equitable relief as a result.

221.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VIII

### UNJUST ENRICHMENT

### (ON BEHALF OF A MULTISTATE CLASS UNDER THE LAWS OF EACH STATE WHERE DEFENDANT DOES BUSINESS, OR, ALTERNATIVELY, ON BEHALF OF EACH OF THE INDIVIDUAL STATE CLASSES)

222.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

223.    Plaintiff and the Class Members would not have contracted with Defendant for energy had they known the truth about Defendant's variable energy rates.

224.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members.

225.    It would be unjust and inequitable for Defendant to retain the payments Plaintiff and Class Members made for excessive energy charges.

226.    Therefore, Defendant is liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendant's actions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

(b)    Find that Defendant, Major Energy, has committed the violations of law alleged herein;

(c)    Render an award of compensatory damages of at least $100,000,000, the precise amount of which is to be determined at trial;

(d)     Issue an injunction or other appropriate equitable relief requiring
Defendant to refrain from engaging in the deceptive practices alleged
herein;

(e)     Declare that Defendant has committed the violations of law alleged herein;

(f)     Render an award of punitive damages;

(g)     Enter judgment including interest, costs, reasonable attorneys' fees, costs,
and expenses; and

(h)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine

any issue triable of right.

Dated: January 14, 2021
Armonk, New York                         **WITTELS MCINTURFF PALIKOVIC**

                                 By:     Steven L. Wittels
                                         Steven L. Wittels
                                         J. Burkett McInturff
                                         Susan J. Russell* (*pro hac vice motion forthcoming*)
                                         18 HALF MILE ROAD
                                         ARMONK, NEW YORK 10504
                                         Telephone: (914) 319-9945
                                         Facsimile:  (914) 273-2563
                                         slw@wittelslaw.com
                                         jbm@wittelslaw.com
                                         sjr@wittelslaw.com

                                         **FINKELSTEIN, BLANKINSHIP,
                                         FREI-PEARSON & GARBER, LLP**
                                         D. Greg Blankinship
                                         Chantal Khalil
                                         1 North Broadway, Suite 900
                                         White Plains, New York 10601
                                         Tel: (914) 298-3281
                                         Fax: (914) 824-1561
                                         gblankinship@fbfglaw.com
                                         ckhalil@fbfglaw.com

                                         *Attorneys for Plaintiff and the Proposed Class*