**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGELA GLIKIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MAJOR ENERGY ELECTRIC SERVICES, LLC,<br><br>Defendant. | **Case No. 7:21-cv-00356**<br><br>**The Honorable**<br>**Vincent L. Briccetti** |

**DEFENDANT MAJOR ENERGY ELECTRIC SERVICES, LLC'S BRIEF IN**
**SUPPORT OF ITS MOTION TO STAY PURSUANT TO 9 U.S.C. § 3 OR,**
**IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**

April 5, 2021

ECKERT SEAMANS CHERIN & MELLOTT, LLC
Kelly R. Koster
10 Bank Street, Suite 700
White Plains, NY 10606
(914) 949-2909
kkoster@eckertseamans.com

Kevin P. Allen (*pro hac vice motion forthcoming*)
Thomas E. Sanchez (*admitted pro hac vice*)
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
(412) 566-6000
kpallen@eckertseamans.com
tsanchez@eckertseamans.com

*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

I. BACKGROUND ........................................................................................................ 2

    A. The Parties ........................................................................................................ 2

    B. Glikin's Claims against Major ......................................................................... 2

    C. Glikin Initially Enrolled with Entrust in 2013 ................................................ 3

    D. In May 2016, Entrust Assigned its Contract with Glikin to NG&E ................. 3

    E. Before the Term of the Entrust Contract Expired, NG&E Offered Renewal Options to Glikin Pursuant to its Terms of Service, which Included an Arbitration Clause ............................. 4

    F. NG&E Assigned the NG&E Contract to Major in 2018 ..................................... 5

    G. Glikin's Complaint Relies on the Entrust Contract ............................................ 6

II. ARGUMENT ............................................................................................................ 7

    A. Glikin's Claims Are Subject to Binding Arbitration under the NG&E Contract ................. 7

        1. The Parties Agreed to Arbitrate ................................................................. 9

        2. Glikin's Claims Fall under the Scope of the Arbitration Agreement ........................... 16

        3. All of Glikin's Claims Are Arbitrable ......................................................... 17

        4. A Stay is the Proper Remedy .................................................................... 17

    B. In the Alternative, the Transfer of this Action to the U.S. District Court for the District of Maryland Is Appropriate ............................................................. 18

III. CONCLUSION ........................................................................................................ 22

## **TABLE OF AUTHORITIES**

**Cases**

Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d 24 (2d Cir. 2002) ........ 17

Am. Express Co. v. Italian Colors Rest., 570 U.S. 228 (2013) ..................................................... 1

Am. Home Assurance Co. v. New Community Corp., No. 10-cv-7489,
    2011 WL 13383822 (S.D.N.Y. Aug. 25, 2011) ......................................................... 17

Arakawa v. Japan Network Grp., 56 F. Supp. 2d 349 (S.D.N.Y. 1999) ........................................ 9

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011) .................................................. 1, 7, 8

Atl. Marine Constr. Co. v. U.S. Dis. Ct. for W. Dist. of Tex., 571 U.S. 49 (2013) .......... 19, 21, 22

Attorney Grievance Comm'n of Md. v. Donnelly, 182 A.3d 743 (Md. 2018) ............................ 13

Badinelli v. Tuxedo Club, 183 F. Supp. 3d 450 (S.D.N.Y. 2016) ............................................. 17

Boss Worldwide LLC v. Crabill, No. 19-cv-2363,
    2020 WL 1243805 (S.D.N.Y. Mar. 16, 2020) ......................................................... 17

Brito v. Major Energy Elec. Servs., LLC, No. 20-cv-230, --- F. Supp. 3d ----,
    2021 WL 1060283 (D. Md. Mar. 18, 2021) ..................................... 1, 11, 13, 14, 15

Carl Zeiss Microscopy, LLC v. Vashaw Scientific, Inc., No. 19-cv-3540,
    2020 WL 85195 (S.D.N.Y. Jan. 2, 2020) ................................................................. 19

Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006) ................................................. 8

Citizens Bank v. Alafabco, Inc., 539 U.S. 52 (2003) .................................................................... 8

CompuCredit Corp. v. Greenwood, 565 U.S. 95 (2012) .............................................................. 1

Contacare, USA, Inc. v. Labs. Contapharm, No. 85-cv-794,
    1986 WL 3504 (S.D.N.Y. Mar. 20, 1986) ............................................................. 7, 19

Cour Pharms. Dev. Co. v. Phosphorex, Inc., No. 20-cv-4417,
    2021 WL 1062568 (S.D.N.Y. Mar. 19, 2021) ......................................................... 17

Dragonfly Capital Partners, LLC v. Schnaier, No. 15-cv-7190,
    2015 WL 13729140 (S.D.N.Y. Dec. 14, 2015) .................................................... 17, 18

Effron v. Sun Line Cruises, Inc., 67 F.3d 7 (2d Cir. 1995) ........................................................ 20

Fed. Deposit Ins. Corp. v. Schaffer, 731 F.2d 1134 (4th Cir. 1984)............................................. 13

GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377 (2d Cir. 2006) ................ 10

Gonzales v. Agway Energy Servs., LLC, No. 18-cv-235,
    2019 WL 910669 (N.D.N.Y. Feb. 25, 2019) ............................................................................. 20

In re Frito-Lay N. Am., Inc. All Natural Litig., No. 12-md-2413,
    2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013)..................................................................... 10, 11

Kashef v. BNP Paribas SA, 442 F. Supp. 3d 809 (S.D.N.Y. 2020)............................................. 10

Katz v. Cellco P'ship, 794 F.3d 341 (2d Cir. 2015) ............................................................... 8, 18

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) .................................................... 9, 10

Kolker v. Biggs, 99 A.2d 743 (Md. 1953) ............................................................................... 13, 14

Lahoud v. Document Techs. LLC, No. 17-cv-1211,
    2017 WL 5466704 (S.D.N.Y. Nov. 14, 2017)........................................................................... 20

Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531 (2d Cir. 1997) ......................... 10

Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530 (2012)..................................................... 1

Martinez v. Bloomberg LP, 740 F.3d 211 (2d Cir. 2014) ........................................................... 20

Massen v. Cliff, No. 02-cv-9282, 2003 WL 2012404 (S.D.N.Y. May 1, 2003) ................. 8, 9, 18

McLean v. LaClair, No. 19-cv-1227, 2021 WL 671650 (N.D.N.Y. Feb. 22, 2021) ................... 13

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983) ................................. 8

Nat'l Union Fire Ins. Co. of Pittsburgh v. Wynn Las Vegas, LLC, No. 20-cv-3139,
    --- F. Spp. 3d ----, 2020 WL 7647177 (S.D.N.Y. Dec. 23, 2020)............................................. 21

Oldroyd v. Elmira Sav. Bank, 134 F.3d 72 (2d Cir. 1998)............................................................ 9

Parness v. Eplus, Inc., No. 20-cv-7266, 2021 WL 827770 (S.D.N.Y. Mar. 4, 2021) ........... 19, 20

Peters & Bauer, Inc. v. Ricoh Ams. Corp., No. 08-cv-277,
    2008 WL 11333991 (W.D. Tex. Dec. 17, 2008) ......................................................................... 9

Porter v. Gen. Boiler Casing Co., 396 A.2d 1090 (Md. 1979) .................................................... 13

Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63 (2010) ................................................................... 1

Rosenthal v. Walker, 111 U.S. 185 (1884) ............................................................. 12

Sigal v. Firtash, No. 13-cv-7818, 2014 WL 4470426 (S.D.N.Y. Sept. 9, 2014) ......................... 10

Szymczak v. Nissan N. Am., Inc., No. 10-cv-7493,
    2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) ........................................................ 10

Tepper Realty Co. v. Mosaic Tile Co., 259 F. Supp. 688 (S.D.N.Y. 1966) .................................. 8

Vista Food Exch., Inc. v. Champion Foodservice, L.L.C., No. 14-cv-804,
    2014 WL 3857053 (S.D.N.Y. Aug. 5, 2014) ......................................................... 20

Vitricon, Inc. v. Midwest Elastomers, Inc., 148 F. Supp. 2d 245 (E.D.N.Y. 2001) ..................... 20

**Statutes**

9 U.S.C. § 2 ............................................................................................... 7

9 U.S.C. § 3 ............................................................................................. 1, 8

9 U.S.C. § 4 ............................................................................................... 1

28 U.S.C. § 1404 ........................................................................................ 18

Plaintiff Angela Glikin alleges that Defendant Major Energy Electric Services, LLC ("Major") charged her variable electricity rates that did not reflect "market conditions" in purported violation of its contractual promises.  Regardless of the merits of Glikin's claims, which fail as a matter of law for the reasons set forth in Major's Motion to Dismiss, Glikin's claims against Major must proceed in arbitration pursuant to the arbitration provision set forth in the governing contract, if they proceed at all.  Accordingly, Major requests that the Court enter an Order, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), staying this action because all of Glikin's claims are "referable to arbitration under an agreement in writing for such arbitration."  9 U.S.C. § 3.[1]

Under the FAA, arbitration agreements are presumed to be valid and enforceable according to their terms.  Indeed, in a series of decisions, the Supreme Court of the United States repeatedly confirmed that the FAA strongly favors the validity and enforceability of arbitration agreements and that the terms of such agreements must be vigorously enforced.  See Am. Express Co. v. Italian Colors Rest., 570 U.S. 228 (2013); Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530, 532 (2012); CompuCredit Corp. v. Greenwood, 565 U.S. 95, 98 (2012); AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 336 (2011); Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 67 (2010). That line of precedent makes clear that arbitration agreements, like the one at issue here, must be enforced as written.  Accordingly, Major requests that the Court enter an Order staying this action until "such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.

---

[1] Major is not requesting an order compelling Glikin to arbitrate her claims against Major under 9 U.S.C. § 4.  See Brito v. Major Energy Electric Servs., LLC, --- F. Supp. 3d ---, 2021 WL 1060283, at *8 (D. Md. Mar. 18, 2021) (granting motion under 9 U.S.C. § 3 and explaining that "Sections 3 and 4 of the FAA provide two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4") (citations, quotation marks, brackets, and ellipses omitted). Section 3 applies when a plaintiff, such as Glikin, wrongly initiates a court action when the plaintiff is obligated to pursue her claims in arbitration.  Section 4, on the other hand, applies when a party has refused to participate in mandatory arbitration proceedings that another party has initiated and court intervention is sought to compel the resisting party to engage in the arbitration proceeding.

In the alternative, should the Court determine that a finding cannot be made at this juncture as to whether Glikin must proceed with her claims in arbitration, Major requests that the Court transfer this action to the U.S. District Court for the District of Maryland pursuant to 28 U.S.C. § 1404 for the reasons discussed below.

## I.      BACKGROUND

### A.      The Parties

Glikin is a Maryland citizen whose local electricity utility is Baltimore Gas & Electric ("BGE").  Compl. ¶¶ 8, 27.  In 2013, Glikin switched from BGE to non-party Entrust Energy for the supply portion of her electricity.  Id. ¶¶ 8, 83; Compl., Ex. A.  On May 6, 2016, Entrust notified Glikin that it was assigning her electricity service to non-party National Gas & Electric, LLC ("NG&E").  Compl. ¶¶ 9, 87; Compl., Ex. B.  On March 14, 2018, NG&E and Major sent a joint letter to Glikin, notifying her that NG&E was assigning her electricity service to Major.  Compl. ¶¶ 10, 88; Compl., Ex. C.  Major supplied electricity to Glikin from April 2018 to January 2020. Compl. ¶¶ 27, 93.

### B.      Glikin's Claims against Major

Glikin alleges that Major failed to charge her variable electricity rates that reflected "market conditions" because Major's rates did not match, beat, or move in line with BGE's regulated rates, average wholesale electricity prices, other competitors' rates, or Major's current introductory and fixed-rate offerings.  See, e.g., id. ¶¶ 11-13.  She purports to raise claims on her own behalf as well as a multistate class, comprised of all Major customers who were charged a variable rate for electricity or gas.  Id. ¶ 155.[2]  The Complaint purports to assert eight causes of

---

[2] Despite seeking to represent a putative class comprised of individuals who Major "charged a variable rate for electricity or gas" (Compl. ¶ 155 (emphasis added)), Glikin does not allege that Major ever supplied her gas.  See id. ¶ 8 (alleging that Glikin enrolled "in a fixed-rate plan for electricity"); id. ¶ 83 (same); id. ¶ 88 (alleging that Major was "assigned her electricity supply contract").

action against Major: (1) breach of contract; (2) breach of the implied covenant of good faith and

fair dealing; (3) violation of New York General Business Law (the "GBL") § 349; (4) violation of

GBL § 349-d; (5) unfair and deceptive trade practices; (6) violation of the Maryland Consumer

Protection Act (the "MCPA"); (7) fraud by concealment; and (8) unjust enrichment.  All of these

claims arise from Major's supply of electricity to Glikin pursuant to the parties' contract and are

subject to dismissal for the reasons set forth in Major's Motion to Dismiss under Rule 12.

**C.    Glikin Initially Enrolled with Entrust in 2013.**

In 2013, Glikin enrolled with Entrust for the supply of electricity on a fixed-rate plan.  Id.

¶¶ 8, 83.  She pleads that she received a letter from Entrust at her residence in Monkton, Maryland,

which enclosed the Entrust Contract.  Id. ¶¶ 8, 83; see also Compl., Ex. A.  The Entrust Contract

stated that Entrust would provide "written notification *of the renewal terms* at least 45 days prior

to the renewal date" and that, if Glikin did not respond, Glikin would be transitioned to a month-

to-month variable-rate plan.  See Compl., Ex. A, at 3 ("Term" provision) (emphasis added).

According to Glikin, the term of the Entrust Contract expired in October 2016.  Comp. ¶ 9.

The Entrust Contract also contained a Maryland choice-of-law and forum-selection clause,

stating that "[v]enue for any lawsuit brought to enforce any term or condition of this Agreement

or to construe the terms hereof shall lie exclusively in the State of Maryland."  Compl., Ex. A at 4

("Choice of Laws" term).

**D.    In May 2016, Entrust Assigned its Contract with Glikin to NG&E.**

On May 6, 2016, Entrust notified Glikin that it "will assign your electricity to National Gas

& Electric."  Compl. ¶ 87; Compl., Ex. B; see also Declaration of Paul Konikowski, dated Apr. 1,

2021, attached as Exhibit A, at ¶¶ 4-5; Ex. 1 to Konikowski Decl.  Glikin pleads that she received

a letter from NG&E dated May 6, 2016 at her residence in Monkton, Maryland, which informed

her of the assignment.  Compl. ¶ 87; see also Ex. A, Konikowski Decl., at ¶¶ 4-5, 8.  That letter notified Glikin that NG&E "will honor your current agreement in place with Entrust" and that "[i]f you have a fixed rate plan with Entrust, your service will continue with the same fixed rate *until the end of your contract term* or upon cancellation."  Compl., Ex. B, at 2 (emphasis added); Ex. 1 to Konikowski Decl. (same); see also id. at 2 ("[NG&E] will honor your current agreement with Entrust, so no changes will occur with their terms or conditions *until the contract end date*.") (emphasis added).

As of July 14, 2016, NG&E became Glikin's electricity supplier, and, as promised, NG&E initially supplied electricity to Glikin in accordance with the Entrust Contract, the term of which had not yet expired.  Ex. A, Konikowski Decl., at ¶ 15.

**E.      Before the Term of the Entrust Contract Expired, NG&E Offered Renewal Options to Glikin Pursuant to its Terms of Service, which Included an Arbitration Clause.**

On July 21, 2016, more than forty-five days prior to the expiration of the term of the Entrust Contract, NG&E mailed Glikin a letter, stating that her "contract is set to expire on 9/7/2016" and offering renewal options.  Id. at ¶¶ 6, 9, 12; Ex. 2 to Konikowski Decl.  That letter was mailed to the same address in Monkton, Maryland at which Glikin received the Entrust Contract in 2013 and Entrust's and NG&E's May 6, 2016 letter, notifying Glikin of the assignment to NG&E.  Id. at ¶¶ 8-9; Compl. ¶¶ 8-9, 87.  NG&E mailed the July 21, 2016 letter to Glikin in accordance with its standard business practices, and the letter was not returned to NG&E as undeliverable or for any other reason.  Ex. A, Konikowski Decl., at ¶¶ 10-11.

In the July 21, 2016 letter, NG&E offered the following renewal options to Glikin: (1) she could select a new rate on NG&E's website; (2) she could call NG&E to select a plan; or (3) she could do nothing, thereby resulting in her account being transitioned to a month-to-month variable-rate plan.  Id. at ¶¶ 12-13; Ex. 2 to Konikowski Decl.  NG&E included a copy of its terms of service

(the "NG&E Contract") with the July 21, 2016 letter mailed to Glikin.  Ex. A, Konikowski Decl. at ¶ 14; Ex. 2 to Konikowski Decl.  The enclosed NG&E Contract set forth terms that would apply to Glikin's variable-rate plan if that was the renewal option she chose.  Ex. A, Konikowski Decl., at ¶¶ 12, 14; Ex. 2 to Konikowski Decl.

The NG&E Contract contains a "Mandatory Arbitration" provision, requiring that disputes be resolved in a mandatory binding arbitration proceeding before the American Arbitration Association.  Ex. A, Konikowski Decl., at ¶ 14; Ex. 2 to Konikowski Decl. at ¶ 11.  Specifically, the provision states in relevant part:

> **11.    Mandatory Arbitration.**  Any claim, dispute or controversy, regarding any contract, tort, statute, or otherwise ('Claim'), arising out of or relating to this agreement or the relationship among the parties hereto shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA") under the AAA Commercial or Consumer rules, as applicable, in effect at the time the Claim is filed ("AAA Rules") . . . .

Ex. 2 to Konikowski Decl. at ¶ 11. The NG&E Contract also contains a class action waiver provision, stating that "[a]ny Claim permissible herein must be brought in the party's individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff, or similar proceeding ('Class Action')."  Ex. 2 to Konikowski Decl. at ¶ 12.

Glikin pleads that, after the term of the Entrust Contract expired, her account was "defaulted onto *NG&E's* variable rate plan."  Compl. ¶ 9 (emphasis added).  NG&E's records show no contact from Glikin in response to the July 21, 2016 renewal letter.  Ex. A, Konikowski Decl., at ¶ 15.  As a result, NG&E transitioned her account to a month-to-month variable-rate plan pursuant to the terms of the NG&E Contract provided to Glikin on July 21, 2016.  Id.

## F.    NG&E Assigned the NG&E Contract to Major in 2018.

On March 14, 2018, NG&E and Major jointly sent a letter to Glikin, notifying her that NG&E "will assign your ELECTRIC service to Major" in April 2018.  Compl. ¶¶ 10, 88; Compl.,

Ex. C; see also Declaration of Kevin M. McMinn, dated Apr. 1, 2021, attached as Exhibit B, at ¶¶ 4-5; Ex. 1 to McMinn Decl. Glikin pleads that she received that letter at her residence in Monkton, Maryland.  Compl. ¶¶ 10, 88.  The address at which Glikin received the March 14, 2018 letter is the same address to which NG&E mailed its July 21, 2016 letter and the NG&E Contract.  See Ex. A, Konikowski Decl., at ¶¶ 8-9.

The March 14, 2018 letter stated that Major "will honor your current agreement in place with National Gas & Electric" and that NG&E variable-rate customers would "continue under the same variable ELECTRIC rate."  Ex. B, McMinn Decl., at ¶ 8; Ex. 1 to McMinn Decl.; Compl., Ex. C.  Entrust had never supplied Glikin with electricity under a variable rate (Compl. ¶¶ 8-9, 83); as of March 14, 2018, only NG&E had supplied Glikin with electricity under a variable rate.  Major charged Glikin a variable electricity rate pursuant to the terms of the NG&E Contract from approximately April 20, 2018 until January 29, 2020.  Ex. B, McMinn Decl., at ¶ 10.

## G.    Glikin's Complaint Relies on the Entrust Contract.

On January 14, 2021, Glikin initiated this action against Major in contravention of the arbitration provision set forth in the NG&E Contract, which was assigned to Major.  In her Complaint, Glikin alleges that the Entrust Contract – not the superseding NG&E Contract – was assigned to Major and pleads no facts whatsoever regarding NG&E's July 21, 2016 letter or the NG&E Contract.  Despite advancing claims based on the Entrust Contract, Glikin ignored that contract's forum-selection clause, mandating that all disputes be resolved in Maryland.[3]

---

[3] Major contends that the NG&E Contract is the operative contract.  Glikin, however, alleges that the initial Entrust Contract was assigned to NG&E and then to Major and, thus, is the operative contract.  Even if Glikin were correct, Glikin filed this action in this Court in direct contravention of the Entrust Contract's forum-selection clause, which required her to file her claims in Maryland.  See Compl., Ex. A, at 4 ("**Choice of Laws.**  Venue for any lawsuit brought to enforce any term or condition of this agreement or to construe the terms hereof shall lie exclusively in the State of Maryland.") (bold emphasis in original).  Whichever contract governs (and Major contends that the NG&E Contract governs), this dispute does not belong in this Court.

## II.    ARGUMENT

Glikin cannot pursue her claims against Major in this Court because Major supplied electricity to her under the NG&E Contract, which requires that all claims be resolved by arbitration and prohibits her from representing or joining a class.  Given that Glikin is bound by the arbitration provision set forth in the NG&E Contract and that all of her claims fall within the scope of that provision, a stay under 9 U.S.C. § 3 is appropriate.  In the alternative, should the Court determine that the NG&E Contract is not applicable or that a finding as to its applicability cannot be made at this juncture, Major requests that this action be transferred to the U.S. District Court for the District of Maryland pursuant to 28 U.S.C. § 1404 based on the forum-selection clause set forth in the Entrust Contract, which Glikin contends it the operative contract.[4]  Although Major disputes that the Entrust Contract governs, Glikin's claims cannot be litigated in this Court pursuant to the terms of either the NG&E Contract or the Entrust Contract.

### A.    Glikin's Claims Are Subject to Binding Arbitration under the NG&E Contract.

The FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  That provision "reflect[s] both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract,'" such that "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms."  Concepcion, 563 U.S. at 339

---

[4] Major does not concede or argue that the Entrust Contract controls.  But Glikin does, so she, under her own theory, was obligated to file her claims in Maryland.  Major is not "precluded from invoking [the venue] provision[] of the contract" in the alternative, even though it contends that the Entrust Contract does not control.  Contacare, USA, Inc. v. Labs. Contapharm, 1986 WL 3504, at *2 (W.D.N.Y. Mar. 20, 1986).  In the transferee forum, Major can raise the defenses available to it, including this argument that the NG&E Contract, not the Entrust Contract, is applicable.

(internal citations omitted); see also Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.").[5] "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Id. at 24-25.

Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. "Thus, the relevant statutory language indicates that a stay, rather than dismissal, is the appropriate remedy" where, as here, a party has initiated a court proceeding to resolve claims in violation of an arbitration agreement. Massen v. Cliff, 2003 WL 2012404, at *2 (S.D.N.Y. May 1, 2003); see also Katz v. Cellco P'ship, 794 F.3d 341, 346 (2d Cir. 2015) (confirming that "the text, structure, and underlying police of the FAA mandate a stay of proceedings" when the claims are referable to arbitration); Tepper Realty Co. v. Mosaic Tile Co., 259 F. Supp. 688, 692-93 (S.D.N.Y. 1966) (holding that defendant was "entitled to a stay of these proceedings under § 3" and that "[i]f plaintiffs wish to enforce the contract against [the defendant], they must seek

---

[5] The Supreme Court has made clear that the FAA is extremely broad and applies to any transaction directly or indirectly affecting interstate commerce. See, e.g., Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003). There is no question that the activities at issue here involve interstate commerce. Glikin is a Maryland resident (Compl. ¶ 8) and alleges that Major's main office is located in New York (id. ¶¶ 26, 28). Further, the arbitration provision in the NG&E Contract expressly states that "[t]his clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act." Ex. 2 to Konikowski Decl., at ¶ 11. Also, Glikin purports to bring this action on behalf of a putative multistate class comprised of consumers in any state who were supplied electricity or gas by Major. Compl. ¶ 155.

arbitration.  If [the defendant] rejects their demand for arbitration, plaintiffs are then entitled to seek to compel arbitration under § 4 of the Act").[6]  In resolving a motion for a stay under Section 3, the Court "may consider all the materials submitted in connection with the motion, including the affidavits."  Massen, 2003 WL 2012404, at *3.

This Court considers four factors in determining whether a motion to stay an action under Section 3 is appropriate: "first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration."  Id. (citing Oldroyd v. Elmira Sav. Bank, 134 F.3d 72, 75-76 (2d Cir. 1998) and other citations omitted).

### 1.      The Parties Agreed to Arbitrate.

"In determining whether parties have agreed to arbitrate, courts apply generally accepted principles of contract law."  Arakawa v. Japan Network Grp., 56 F. Supp. 2d 349, 352 (S.D.N.Y. 1999).  Here, Maryland law applies because the NG&E Contract, which was assigned to Major in 2018, contains a Maryland choice-of-law provision.  See Ex. 2 to Konikowski Decl., at ¶ 13(c) ("This Agreement will be governed by, interpreted, construed and enforced in accordance with the laws of the State of Maryland, without regard to principles of conflicts of law.").[7]  Moreover, under New York choice-of-law rules, Maryland law applies to all of Glikin's claims.  See Klaxon Co. v.

---

[6] As set forth above, Major is not requesting an affirmative order to engage in arbitration or to otherwise compel arbitration under 9 U.S.C. § 4.  See supra pg. 1, n.1.  Although litigants frequently seek to compel arbitration and stay court proceedings in the same motion, "Sections 3 and 4 of the FAA are separate avenues for the enforcement of an arbitration clause."  Peters & Bauer, Inc. v. Ricoh Ams. Corp., 2008 WL 11333991, at *1 (W.D. Tex. Dec. 17, 2008).

[7] The Entrust Contract, upon which Glikin relies, also contains a Maryland choice-of-law provision.  See Compl., Ex. A, at 4 (choice-of-laws provision).

Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941) (holding that courts apply the choice-of-law rules of the forum state in diversity cases).

"New York uses an interest-analysis approach to choice of law: the law of the jurisdiction with the greatest interest usually applies." Kashef v. BNP Paribas SA, 442 F. Supp. 3d 809, 817 (S.D.N.Y. 2020). This "interest analysis" applies "to choice of law in tort [claims] in New York," such as Glikin's fraud-based and unjust enrichment claims. GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d Cir. 2006); see also Sigal v. Firtash, 2014 WL 4470426, at *7 (S.D.N.Y. Sept. 9, 2014) (fraud and unjust enrichment claims considered tort claims for choice-of-law purposes). Further, courts in multistate putative class actions almost universally apply the law of the buyer's domicile. See Szymczak v. Nissan N. Am. Inc., 2011 WL 7095432, at *12 (S.D.N.Y. Dec. 16, 2011) ("States have no interest in applying their consumer protection statutes to buyers who live out of state and whose purchases occur out of state."). Here, Glikin admits that she is a Maryland resident and that Major supplied her electricity in Maryland. Compl. ¶¶ 8, 27. Thus, Maryland law applies to Glikin's tort claims.

A "center of gravity" or "grouping of contacts" approach applies to contract claims and requires courts to "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997). Courts applying these principles at the pleading stage have found that non-New York plaintiffs who purchased the defendant's product outside of New York cannot bring contract claims under New York law. See In re Frito-Lay N. Am, Inc. All Natural Litig., 2013 WL 4647512, at *19 (E.D.N.Y. Aug. 29, 2013) ("These states [i.e., states other than New York] would be the places of contracting and performance. These states are also where these

10

plaintiffs are domiciled.  As such, [those states'] law should govern their [contract] claims . . .").  Given that Glikin is a Maryland resident, who received electricity from Major in Maryland under a contract she received and accepted in Maryland, Maryland law applies to her contract claims.

Under Maryland law, "[a] contract is formed when an unrevoked offer made by one person is accepted by another."  Brito v. Major Energy Electric Servs., LLC, --- F. Supp. 3d ----, 2021 WL 1060283, at *12 (D. Md. Mar. 18, 2021) (citations and quotation marks omitted).  "Thus, mutual assent is an integral component of every contract."  Id.  "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms."  Id. at *13 (citation and quotation marks omitted).  Acceptance may be established "by actions as well as words."  Id.

Here, the application of well-settled principles of Maryland law regarding contract interpretation demonstrate that, in 2016, Glikin entered into the NG&E Contract, which was later assigned to Major in 2018.  Glikin alleges, and premises her Complaint, on the contention that she knowingly contracted with Entrust for electricity services in 2013, that the Entrust Contract was assigned to NG&E in 2016 (and, allegedly, then to Major in 2018), and that Major failed to comply with the pricing term of the Entrust Contract.  Glikin admits that she received a copy of the Entrust Contract in 2013 and a May 6, 2016 letter from Entrust and NG&E, notifying her of the assignment of the Entrust Contract to NG&E.  Compl. ¶¶ 8-9, 87; Exs. A, B to Compl.  Glikin also admits that she received a March 14, 2018 letter from NG&E and Major, notifying her of the assignment to Major.  Compl. ¶¶ 10, 88; Ex. C to Compl.

Thus, by her own admission, Glikin received correspondence at her residence in Monkton, Maryland from Entrust, NG&E, and Major over a period of approximately five years, demonstrating that each of these entity's mailing processes worked and that Glikin's correct address in Monkton, Maryland was used to communicate with her.  See Compl. ¶ 8 (alleging that

11

Glikin received the Entrust Contract in 2013); id. ¶ 9 (alleging that Glikin received a May 6, 2016 letter from NG&E and Entrust); id. ¶ 10 (alleging that Glikin received a March 14, 2018 letter from Major and NG&E).  Glikin also admits that, after NG&E acquired her electricity account from Entrust in 2016 and after the term of the Entrust Contract expired, she agreed to remain a variable-rate customer of NG&E and was such a variable-rate customer of NG&E when NG&E assigned her electricity account to Major in 2018.  Id. ¶¶ 9-10.  The May 6, 2016 letter that Glikin received from Entrust and NG&E made clear that: "Entrust will assign your electricity service to National Gas & Electric, LLC" effective with her "first meter read date after June 8, 2016"; NG&E would "honor" the Entrust Contract "through the life of [the] current contract"; and NG&E would charge Glikin "the same fixed rate *until the end of [her] contract term*."  Compl., Ex. B (emphasis added); Ex. 1 to Konikowski Decl. (same).

NG&E's business records establish that, on July 21, 2016, NG&E mailed to Glikin the NG&E Contract, along with a renewal letter, in accordance with its standard procedures.  Ex. A, Konikowski Decl., at ¶¶ 6, 9-10, 14; Ex. 2 to Konikowski Decl.  It was NG&E's practice to mail renewal letters, like the July 21, 2016 letter, by first-class mail and to retain a copy of the as-mailed document.  Ex. A, Konikowski Decl., at ¶ 10.  The July 21, 2016 letter was mailed to Glikin's address in Monkton, Maryland (the same address at which Glikin received the May 6, 2016 and March 14, 2018 letters referenced in the Complaint) and was not returned to NG&E as undeliverable or for any other reason.  Id. ¶¶ 9-10.

It is well-settled that, "if a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed, from the known course of business in the post-office department, that it reached its destination at the regular time, and was received by the person to whom it was addressed."  Rosenthal v. Walker, 111 U.S. 185, 193 (1884).  Since

Rosenthal, federal and state courts routinely apply the presumption that properly mailed documents are received in due course by the addressee or after a normal interval (*i.e.*, two or three days).  See Fed. Deposit Ins. Corp. v. Schaffer, 731 F.2d 1134, 1137 (4th Cir. 1984) ("Schaffer and Malin must be presumed to have received the notice delivered to their homes in the regular course of mail delivery."); McLean v. LaClair, 2021 WL 671650, at *8 n.7 (N.D.N.Y. Feb. 22, 2021) ("Plaintiff's sworn statement that he mailed the letters would establish his entitlement to this presumption . . . ."); Kolker v. Biggs, 99 A.2d 743, 746 (Md. 1953) ("It is an established rule of evidence that the testimony of a witness that he properly addressed, stamped and mailed a letter raises a presumption that it reached its destination at the regular time and was received by the person to whom it was addressed.").

"Acceptance can be accomplished by acts as well as words," and "[n]otification of acceptance is not essential to the formation of a contract."  Porter v. Gen. Boiler Casing Co., 396 A.2d 1090, 1094 (Md. 1979).  "[A] party's conduct sufficient to manifest acceptance of the terms of a written contract will bind that party to the written contract."  Id. at 1094; see also Brito, --- F. Supp. 3d ----, 2021 WL 1060283, at *13 ("'Importantly, acceptance may be manifested by actions as well as words.'") (citation omitted).  "A person accepts an offer of services through silence where the person knows the terms on which the services are offered, receives the benefit of the services, and does not reject the offer despite having a reasonable opportunity to do so."  Attorney Grievance Comm'n of Md. v. Donnelly, 182 A.3d 743, 769 (Md. 2018) (citations omitted).

In Brito, the District of Maryland recently applied these principles of Maryland law to hold that a plaintiff was bound by an arbitration provision set forth in the contract that Major mailed to her.  There, Brito alleged that she never consented to enroll with Major and, thus, the arbitration provision in Major's contract did not apply to her claims.  Major, however, submitted evidence

13

that it mailed an enrollment letter and a renewal letter to her residence, both of which included a copy of Major's terms of service, and "neither was returned to sender as undeliverable."  --- F. Supp. 3d ----, 2021 WL 1060283, at *14.  The court held that such evidence "establishes a presumption that Ms. Brito received" the letters and terms of service because "the testimony of a witness that he properly addressed, stamped and mailed a letter raises a presumption that it reached its destination at the regular time and was received by the person to whom it was addressed."  Id. (quoting Kolker, 99 A.2d at 746).  Further, Brito remained a customer of Major for approximately two years before canceling her services, thereby benefitting from Major's services.  Id.  The court concluded that Brito accepted the terms of Major's contract, including its arbitration provision, because she "took the benefits of Major's electricity services for nearly two years, without objection" and failed to "rebut the presumption that she was put on notice of the change in her electricity supplier through her receipt of the Agreement in the mail, together with the Enrollment Letter and the Renewal Letter."  Id. at *17.

Similarly, here, Glikin pleads that she knowingly enrolled with Entrust for electricity supply services in 2013, that she knowingly remained a variable-rate customer of NG&E after Entrust assigned her account to NG&E and after the term of the Entrust Contract expired, and that she knowingly remained a variable-rate customer of Major after NG&E assigned her account to Major.  She admits to receiving correspondence from Entrust, NG&E, and Major at her residence in Monkton, Maryland over the course of five years, from 2013 to 2018.  Compl. ¶¶ 8-10.  Although Glikin pleads no facts regarding her receipt of NG&E's July 21, 2016 letter, which included a copy of the NG&E Contract,[8] NG&E mailed those documents to Glikin at the same

---

[8] In the Complaint, Glikin pleads that, in December 2020, prior to initiating this action, she "mailed a [demand] letter to Defendant in compliance with Mass. Gen. Laws Ch. 93A, § 9(3)" and that "Plaintiff did not receive a full and satisfactory response to her letter."  Compl. ¶ 202.  Major disputes Glikin's characterization of its response to Glikin's

address at which she received prior correspondence from Entrust and NG&E and later correspondence from NG&E and Major.  Ex. A, Konikowski Decl., at ¶¶ 8-10, 14.  In mailing the July 21, 2016 renewal letter and NG&E Contract to Glikin, NG&E followed its regular business operations, retained a copy of the as-mailed documents, and the documents were not returned to NG&E as undeliverable or for any other reason.  Id. at ¶ 10.  Glikin also never contacted NG&E before or after the expiration of the Entrust Contract.  Id. at ¶ 15.  Instead, Glikin paid the variable monthly rates that NG&E charged her, without objection, until her account was assigned to Major.  Id. at ¶ 16.  Therefore, as in Brito, this evidence establishes a presumption that Glikin received the July 21, 2016 letter and the NG&E Contract.

Further, like Brito, Glikin remained an NG&E customer until her electricity account was assigned to Major in April 2018 (and then remained a Major customer until January 2020), thereby taking "the benefits of [NG&E's and] Major's electricity services" for years, "without objection."  Brito, --- F.3d ----, 2021 WL 1060283, at *14.  At the time of the assignment from Entrust to NG&E, NG&E promised only to honor the terms of the Entrust Contract "until the end of [her] contract term."  Compl., Ex. B, at 1; Ex. 1 to NG&E Decl. (same); see also id. at 2 ("[NG&E] will honor your current agreement with Entrust, so no changes will occur with their terms or conditions *until the contract end date*.") (emphasis added).  Tellingly, Glikin pleads that "[i]n or around October 2016, Plaintiff's fixed rate plan [under the Entrust Contract] ended," at which time she was "defaulted onto NG&E's variable rate plan."  Compl. ¶ 9; Ex. A, Konikowski Decl., at ¶ 15.  NG&E's July 21, 2016 renewal letter, which enclosed the NG&E Contract, notified Glikin that that the Entrust Contract was "set to expire on 9/7/2016," offered renewal and cancellation

---

demand letter but notes that it attached copies of NG&E's July 21, 2016 letter and the NG&E Contract to its response.  Glikin, however, conveniently omits any mention of the July 21, 2016 letter and the NG&E Contract in the Complaint.

options, and informed her that doing nothing in response to the letter would result in her account being transitioned to a month-to-month variable-rate plan.  Ex. A, Konikowski Decl., at ¶¶ 12-13; Ex. 2 to Konikowski Decl.  By doing nothing in response to that letter, when the term of the Entrust Contract expired, Glikin was, "defaulted onto NG&E's variable rate plan," Compl. ¶ 9, in accordance with the terms of the NG&E Contract enclosed with the July 21, 2016 letter.[9]

The NG&E Contract contained a "Mandatory Arbitration" provision, requiring that disputes be resolved in a mandatory binding arbitration proceeding before the American Arbitration Association.  Ex. A, Konikowski Decl., at ¶ 14; Ex. 2 to Konikowski Decl., at ¶ 11. The NG&E Contract also contained a class action waiver provision, prohibiting Glikin from representing or joining a class.  Ex. A, Konikowski Decl., at ¶ 14; Ex. 2 to Konikowski Decl., at ¶ 12.  By remaining a variable-rate customer of NG&E from October 2016 through April 2018 and then a variable-rate customer of Major from April 2018 through January 2020 after receiving the NG&E Contract, Glikin manifested assent to the terms of the NG&E Contract, including the arbitration provision.  Accordingly, Glikin agreed to arbitrate the claims raised in this action.

**2.      Glikin's Claims Fall under the Scope of the Arbitration Agreement.**

The NG&E Contract plainly includes an arbitration provision, covering Glikin's claims. That provision states: "Any claim, dispute or controversy, regarding any contract, tort, statute, or otherwise ('Claim'), arising out of or relating to this agreement or the relationship among the parties hereto shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA") . . . ."  Ex. 2 to Konikowski Decl., at ¶ 11.  Such a

---

[9] NG&E sent the July 21, 2016 letter to Glikin more than forty-five days before the expiration of the Entrust Contract in compliance with the terms of the Entrust Contract, which had been assigned to NG&E.  See Compl., Ex. A at pg. 3 ("term" provision).  When Entrust and NG&E notified Glikin of the assignment in May 2016, NG&E promised only that it would "honor [her] current agreement in place with Entrust," with "no changes to the terms or conditions *through the life of [the] current contract*."  Compl., Ex. B (emphasis added); Ex. 1 to Konikowski Decl. (same).

broad arbitration provision, "requiring the submission of any dispute to arbitration, [is] 'precisely the kind of broad arbitration clause that justifies a presumption of arbitrability.'" Am. Home Assurance Co. v. New Community Corp., 2011 WL 13383822, at *3 (S.D.N.Y. Aug. 25, 2011) (citation omitted); see also Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d 24, 32 (2d Cir. 2002) (stating that the phrase "arising out of this Agreement" is consistent with a broad arbitration provision); Badinelli v. Tuxedo Club, 183 F. Supp. 3d 450, 456 (S.D.N.Y. 2016) (finding arbitration clause "broad and plain" because it required that "any dispute, claim or controversy that may arise between him and his firm" was arbitrable) (Briccetti, J.).

Glikin alleges that Major was her electricity supplier and attempts to bring contract, statutory, and fraud claims based on the theory that she was overcharged. These claims arise out of and relate to the services provided, and the rates charged, by Major under the NG&E Contract, and, thus, plainly fall within the scope of that Contract and, in turn, its arbitration provision.

### 3.     All of Glikin's Claims Are Arbitrable.

Given that "there are no federal statutory claims in the complaint," all of the claims that Glikin has attempted to assert against Major are arbitrable. Cour Pharms. Dev. Co. v. Phosphorex, Inc., 2021 WL 1062568, at *5 (S.D.N.Y. Mar. 19, 2021); see also Dragonfly Capital Partners, LLC v. Schnaier, 2015 WL 13729140, at *1 (S.D.N.Y. Dec. 14, 2015) (staying case where all claims fell within scope of arbitration clause and no federal statutory claims were asserted); Boss Worldwide LLC v. Crabill, 2020 WL 1243805, at *3 (S.D.N.Y. Mar. 16, 2020) (noting that statutory claims may be arbitrated absent preclusion by Congress) (Briccetti, J.).

### 4.     A Stay Is the Proper Remedy.

Where, as here, the parties agreed to arbitrate, the arbitration clause encompasses "any dispute" arising under the contract, no federal statutory claims are asserted, all of the claims are

arbitrable and a stay is appropriate.  <u>Dragonfly Capital Partners</u>, 2015 WL 1062568, at *1; <u>see also</u>

<u>Badinelli</u>, 183 F. Supp. 3d at 457 ("It is now settled law in this Circuit that 'the text, structure, and

underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action

have been referred to arbitration and a stay requested.") (quoting <u>Katz</u>, 794 F.3d at 347) (Briccetti,

J.).  Given that all four factors are satisfied, Major requests that the Court stay this action under 9

U.S.C. § 3.  Should Glikin elect not to proceed with her claims in arbitration, the parties will notify

the Court, so that this action may be closed.  <u>See</u> <u>Massen</u>, 2003 WL 2012404, at *2 (explaining

that a stay, rather than dismissal, under such circumstances is appropriate because "the nature of

an arbitration award is such that further judicial action is inevitably necessary in order for the

award to be enforceable," as "[a]rbitration awards are not self-executing").

**B.**     **In the Alternative, the Transfer of this Action to the U.S. District Court for the District of Maryland Is Appropriate.**

In the alternative, should the Court conclude that the NG&E Contract and/or the arbitration

provision therein is not applicable, or that that determination cannot be made at this juncture,

Major requests that the Court transfer this action to the U.S. District Court for the District of

Maryland pursuant to 28 U.S.C. § 1404(a). A district court may transfer a civil action to another

district "where it might have been brought" if transfer is "[f]or the convenience of the parties and

witnesses, [and] in the interest of justice."  28 U.S.C. § 1404(a).  Here, should the Court not grant

Major's requested relief under the FAA, the transfer of this action is warranted based upon the

forum-selection clause set forth in the Entrust Contract upon which Glikin relies in the Complaint.

<u>See</u> Compl., Ex. A, at 3 ("Choice of Laws" provision).  Although Major asserts that the NG&E

Contract (with its class action waiver and mandatory arbitration provision) – not the Entrust

Contract – is the operative contract and in no way concedes that the Entrust Contract is enforceable,

Major moves to transfer in the alternative only if this Court concludes that it cannot grant Major's

requested relief under the FAA.  See Contacare, USA, Inc., 1986 WL 3504, at *2 (dismissing case

for improper venue and finding "no merit to the plaintiffs' argument" that defendant could not

invoke venue provision of contract that the defendant claimed was unenforceable).[10]

In assessing motions to transfer, courts undertake a two-part inquiry, first considering

"whether the action could have been brought in the proposed transferee forum" and then evaluating

the "private-interest and public-interest considerations to determine whether transfer is

appropriate."  Parness v. Eplus, Inc., 2021 WL 827770, at *1 (S.D.N.Y. Mar. 4, 2021) (citations

omitted).  This action could have been brought in the District of Maryland because Glikin is a

Maryland resident who was supplied electricity by Major in Maryland.  Compl. ¶¶ 8, 27.  Thus,

both jurisdiction and venue are proper in the District of Maryland.

With respect to the evaluation of private and public interests, a forum-selection clause

changes the transfer analysis in three ways:

> (1) plaintiff's choice of forum merits no weight; (2) a court evaluating a defendant's
> § 1404(a) motion to transfer based on a forum-selection clause should not consider
> arguments about the parties' private interests; and (3) a § 1404 transfer of venue
> will not carry with it the original venue's choice-of-law rules – a factor that in some
> circumstances may affect public-interest considerations.

Id. (internal brackets and quotation marks omitted and citing Atl. Marine, 571 U.S. at 63-64).

"Only under extraordinary circumstances unrelated to the convenience of the parties' should a

motion to transfer pursuant to a forum selection clause be denied."  Atl. Marine, 571 U.S. at 62.

"A forum selection clause is presumptively enforceable if 'the forum clause was

communicated to the resisting party, has mandatory force and covers the claims and parties

---

[10] The Supreme Court's decision in Atlantic Marine Construction Company v. U.S. District Court for the Western District of Texas, requires Major to raise this argument under Section 1404(a) as opposed to Rule 12(b)(3) because that Rule allows "dismissal only when venue is wrong or improper[, which] depends exclusively on whether th[is] court . . . satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." 571 U.S. 49, 55 (2013).  See Carl Zeiss Microscopy, LLC v. Vashaw Scientific, Inc., 2020 WL 85195, at *3 (S.D.N.Y. Jan. 2, 2020) (noting that, per Atlantic Marine, forum-selection clauses are not generally assessed under Rule 12(b) but assessing clause under Rule 12(b) because it did not preclude litigation in this Court) (Briccetti, J.).

involved in the dispute." Parness, 2021 WL 827770, at *2 (quoting Martinez v. Bloomberg LP, 740 F.3d 211, 217 (2d Cir. 2014)). Here, Glikin ignores the superseding NG&E Contract and, instead, relies on the initial Entrust Contract that she entered into in 2013. The Entrust Contract is attached to the Complaint and contains a forum-selection clause, providing that "[v]enue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms hereof *shall lie exclusively* in the State of Maryland." Compl., Ex. A, at 3 (emphasis added). Glikin cannot argue that the forum-selection clause was not communicated to her, as she relies on other provisions of the two-page Entrust Contract in an attempt to assert claims against Major and the clause is written in plain, unambiguous language that explains that disputes shall be brought in Maryland. See Effron v. Sun Line Cruises, Inc., 67 F.3d 7, 9-10 (2d Cir. 1995) (finding forum-selection clause appearing, in fine print, on ticket reasonably communicated to party and enforceable); Vitricon, Inc. v. Midwest Elastomers, Inc., 148 F. Supp. 2d 245, 247 (E.D.N.Y. 2001) ("A forum selection clause stated in clear and unambiguous language, although in fine print, is considered reasonably communicated to the plaintiff in determining its enforceability.").

The forum-selection clause is mandatory because it requires that "any lawsuit" relating to the Entrust Contract "shall" be resolved "exclusively" in Maryland.[11] The words "shall" and "exclusively" indicate the parties' intent that disputes must be brought in a court located in Maryland, to the exclusion of other courts, including this Court. See Lahoud v. Document Techs. LLC, 2017 WL 5466704, at *4 (S.D.N.Y. Nov. 14, 2017) ("Because the parties agreed that any legal or equitable action to enforce, interpret, or otherwise arising out of the Agreement 'shall rest

---

[11] Because the forum-selection clause "does not specify state or federal court, it would almost certainly be construed to permit suit in either state or federal court." Gonzales v. Agway Energy Servs., LLC, 2019 WL 910669, at *2 (N.D.N.Y. Feb. 25, 2019) (assessing a forum-selection clause containing substantially similar language); see also Vista Food Exch., Inc. v. Champion Foodservice, L.L.C., 2014 WL 3857053, at *3-4 (S.D.N.Y. Aug. 5, 2014) (holding that venue was proper in federal court where the forum-selection clause "does not specify whether venue will be laid in state or federal court, only simply that venue will be in New York County, New York").

exclusively' in the Georgia court and 'shall be brought and defended' there, the forum selection clause is mandatory, and not permissive."); <u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Wynn Las Vegas, LLC</u>, --- F. Supp. 3d ----, 2020 WL 7647177, at *6 (S.D.N.Y. Dec. 23, 2020) ("Further, the forum selection clause is mandatory, as its language is obligatory and clearly manifests an intent to make the forum compulsory and exclusive – namely, by stating that a suit may be brought *only* in New York . . . .") (citation, quotation markets, and brackets omitted and emphasis in original). The claims involved also are subject to the forum-selection clause because the clause encompasses "any lawsuit" relating to "the terms" of the Entrust Contract and Glikin claims that Major breached that Contract by not complying its pricing term.

Given the forum-selection clause, Glikin's preference to litigate this action in this Court is deserving of no weight, and only the public-interest factors may be considered. Public-interest considerations include "administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." <u>Atl. Marine</u>, 571 U.S. at 63 n.6. All of these factors weigh in favor of transfer. First, U.S. Courts data shows that, for the 12-month period ending December 31, 2020, there were 13,930 civil cases pending in the Southern District of New York compared with 4,405 civil cases pending in the District of Maryland. <u>See</u> U.S. Courts, Table C-1 – U.S. District Courts – Civil Statistical Tables for the Federal Judiciary (Dec. 31, 2020), https://www.uscourts.gov/statistics/table/c-1/statistical-tables-federal-judiciary/2020/12/31.In the Southern District of New York, 11,488 civil cases were commenced during that period, whereas only 3,837 civil cases were commenced in the District of Maryland. <u>Id.</u> Thus, transfer to the District of Maryland would not result in administrative difficulties caused by court congestion because there are significantly fewer civil cases pending in that forum.

Second, transfer to the District of Maryland would further the public interest of having localized controversies decided at home because Glikin is a Maryland resident who alleges that she was overcharged for electricity supplied to her in Maryland.  Obviously, Maryland has a much greater interest in Glikin's claims than New York.

Finally, transfer would further the public interest of having the trial of a diversity case in a forum that is at home with the law.  As discussed above, Maryland law applies to Glikin's claims in this action.  Although this Court is fully capable of applying Maryland law, the District of Maryland sits in the State of Maryland and, thus, is more "at home with [Maryland] law."  Atl. Marine, 571 U.S. at 63 n.6.

Consequently, should the Court determine that the NG&E Contract is not applicable or that a determination as to the applicability of the arbitration provision set forth therein cannot be made at this juncture, Major requests, in the alternative, that the Court transfer this action to the U.S. District Court for the District of Maryland because, under Glikin's theory (which Major disputes), the Entrust Contract controls and that Contract contains a mandatory forum-selection clause.

## III.   CONCLUSION

For the foregoing reasons, Major respectfully requests that the Court enter an Order staying this action pursuant to 9 U.S.C. § 3.  Alternatively, Major requests a transfer to the U.S. District Court for the District of Maryland pursuant to 28 U.S.C. § 1404(a).

Dated: April 5, 2021     ECKERT SEAMANS CHERIN
 White Plains, New York   & MELLOTT, LLC

          By: /s/ *Kelly Robreno Koster*
          Kelly Robreno Koster
          10 Bank Street, Suite 700

22

White Plains, NY 10606
(914) 286-2807
kkoster@eckertseamans.com

Kevin P. Allen (*pro hac vice forthcoming*)
Thomas E. Sanchez (*pro hac vice*)
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
(412) 566-6000
kpallen@eckertseamans.com
tsanchez@eckertseamans.com

*Counsel for Defendant*