**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGELA GLIKIN, on behalf of herself and all others similarly situated, | **Case No. 7:21-cv-00356** |
| Plaintiff, | **The Honorable** |
| v. | **Vincent L. Briccetti** |
| MAJOR ENERGY ELECTRIC SERVICES, LLC, | |
| Defendant. | |

**DEFENDANT MAJOR ENERGY ELECTRIC SERVICES, LLC'S**
**BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

April 5, 2021

ECKERT SEAMANS CHERIN & MELLOTT, LLC
Kelly R. Koster
10 Bank Street, Suite 700
White Plains, NY 10606
(914) 949-2909
kkoster@eckertseamans.com

Kevin P. Allen (*pro hac vice motion forthcoming*)
Thomas E. Sanchez (*admitted pro hac vice*)
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
(412) 566-6000
kpallen@eckertseamans.com
tsanchez@eckertseamans.com

*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

I. BACKGROUND ........................................................................................................ 2

    A. Energy Deregulation Allows ESCOs to Supply Electricity to Consumers ........................... 2

    B. Glikin Enrolled with an ESCO in 2013, and Major Acquired her Account in 2018 ............. 3

        1. Glikin Initially Enrolled with Entrust Energy in 2013 ................................................. 3

        2. Entrust Assigned its Contract with Glikin to NG&E in 2016 ........................................ 4

        3. NG&E Assigned its Contract with Glikin to Major in 2018 ......................................... 5

    C. Glikin's Claims against Major Are Not Based on the Contract Terms at Issue .................... 6

II. LEGAL STANDARDS .............................................................................................. 7

    A. Rule 12(b)(1) Standard ....................................................................................... 7

    B. Rule 12(b)(6) Standard ....................................................................................... 8

    C. Choice-of-Law Standard ..................................................................................... 8

III. ARGUMENT ......................................................................................................... 9

    A. Glikin's Claims Are Subject to Arbitration or, in the Alternative, Transfer ........................ 9

    B. This Action Is Subject to Dismissal for Failure to Exhaust Administrative Remedies ....... 10

    C. Glikin's Claims against Major Fail as a Matter of Law ........................................... 12

        1. Glikin's Claim for Breach of Contract (Count I) Fails ................................................ 13

        2. Glikin's Good Faith and Fair Dealing Claim (Count II) Fails ...................................... 17

        3. Glikin's GBL Claims (Counts III and IV) Fail for Lack of Standing ............................ 18

        4. Glikin's Unfair and Deceptive Acts and Practices (Count V), MCPA (Count VI), and
        Fraud by Concealment (Count VII) Claims Fail ......................................................... 20

        4. Glikin's Unjust Enrichment Claim (Count VIII) Fails ................................................ 24

IV. CONCLUSION ....................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

Bell Atl. of Md., Inc. v. Intercom Sys. Corp., 782 A.2d 791 (Md. 2001) .................................... 11

Chambers v. Am. Trans Air, Inc., 17 F.3d 998 (7th Cir. 1994)..................................................... 21

Coda v. Constellation Energy Power Choice, LLC, No. 17-cv-3437,
    2018 WL 3201796 (D.N.J. June 29, 2018) ................................................................................ 14

Cohen v. Hertz Corp., No. 13-cv-1205,
    2013 WL 9450421 (S.D.N.Y. Nov. 26, 2013) ............................................................................ 8

Contacare, USA, Inc. v. Labs. Contapharm, No. 85-cv-794,
    1986 WL 3504 (S.D.N.Y. Mar. 20, 1986) .................................................................................. 10

Corsale v. Sperian Energy Corp., 412 F. Supp. 3d 556 (W.D. Pa. 2019).................................... 17

Crissen v. Gupta, 994 F. Supp. 2d 937 (S.D. Ind. 2014) ............................................................. 21

Cruz v. FXDirectDealer, LLC, 720 F.3d 115 (2d Cir. 2013) ....................................................... 19

Daniyan v. Viridian Energy LLC, No. 14-cv-2715,
    2015 WL 4031752 (D. Md. June 30, 2015) ........................................................... 17, 21, 22, 25

Eaglehead Corp. v. Cambridge Capital Grp., Inc., 170 F. Supp. 2d 552 (D. Md. 2001)........ 17, 18

Gerard v. Traffic Safety, LLC, No. 11-cv-8550, 2012 WL 2866255 (S.D.N.Y. July 2, 2012)...... 8

GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377 (2d Cir. 2006) .................. 9

Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190 (N.Y. 2002).................................... 18, 19

Hamlen v. Gateway Energy Servs. Corp., No. 16-cv-3526,
    2017 WL 892399 (S.D.N.Y. Mar. 6, 2017) .............................................................................. 14

Hebbeler v. First Mariner Bank, No. 17-cv-3641,
    2020 WL 1033586 (D. Md. Mar. 2, 2020)........................................................................... 24, 25

In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.,
    701 F. Supp. 2d 356 (E.D.N.Y. 2010) ...................................................................................... 18

In re Frito-Lay N. Am., Inc. All Natural Litig., No. 12-md-2413,
    2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013)............................................................................ 9

I.S. v. Binghamton City Schl. Dist., 486 F. Supp. 3d 575 (N.D.N.Y. 2020) ................................. 8

J.T. v. de Blasio, No. 20-cv-5878, --- F. Supp. 3d ----,
    2020 WL 6748484 (S.D.N.Y. Nov. 13, 2020) ...................................................... 7, 8

Kashef v. BNP Paribas SA, 442 F. Supp. 3d 809 (S.D.N.Y. 2020)................................................ 9

Kiddie Academy Domestic Franchising, LLC v. Wonder World Learning, LLC,
    No. 17-cv-3420, 2019 WL 1441812 (D. Md. Mar. 31, 2019) ........................................... 21, 22

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) ........................................................ 8

Lane v. Direct Energy Servs., LLC, No. 19-cv-674,
    2020 WL 3211435 (S.D. Ill. June 15, 2020)................................................................. 14

Lane v. Direct Energy Servs., LLC, No. 19-cv-674,
    2020 WL 7443153 (S.D. Ill. Dec. 18, 2020)................................................................. 16

Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531 (2d Cir. 1997) ........................... 9

Major Energy Elec. Servs., LLC v. Horowitz, No. 19-cv-10431,
    2020 WL 4432121 (S.D.N.Y. July 31, 2020) ............................................................... 3

Marshall v. Verde Energy USA, Inc., No. 18-cv-1344,
    2019 WL 6975424 (D.N.J. Dec. 19, 2019)......................................................... 14, 15, 17, 22

Marshall v. Verde Energy USA, Inc., No. 18-cv-1344,
    2020 WL 5905072 (D.N.J. Oct. 5, 2020)...................................................................... 14

McCoy v. Pepco Holdings, Inc., No. 15-cv-2487,
    2016 WL 8678000 (D. Md. June 10, 2016) .............................................................. 11, 12

McVetty v. TomTom N. Am., Inc., No. 19-cv-4908,
    2021 WL 965239 (S.D.N.Y. Mar. 13, 2021) ............................................................. 18, 19

Md. Envt. Trust v. Gaynor, 803 A.2d 512 (Md. 2002)............................................................ 22, 23

Mt. Vernon Props., LLC v. Branch Banking & Trust Co., 907 A.2d 373 (Md. Ct. App. 2006) .. 18

Nieves v. Just Energy N.Y. Corp., No. 17-cv-561,
    2020 WL 6803056 (W.D.N.Y. Nov. 19, 2020) .......................................................... 14, 15

Orange v. Starion Energy PA, Inc., 711 F. App'x 681 (3d Cir. 2017) ....................................... 14

Progressive Mgmt. of N.Y. v. Galaxy Energy LLC, No. 606312/15,
    2016 WL 1228126 (N.Y. Sup. Ct. Mar. 28, 2016) ......................................................... 21

<u>Richards v. Direct Energy Servs., LLC</u>, 915 F.3d 88 (2d Cir. 2019) .................... 3, 14, 16, 23, 24

<u>Rovner v. Just Energy Grp., Inc.</u>, No. 18-cv-2159 (E.D.N.Y. July 31, 2019) ............................. 23

<u>RRC Ne., LLC v. BAA Md., Inc.</u>, 994 A.2d 430 (Md. 2010) ....................................................... 13

<u>Sevugan v. Direct Energy Servs., LLC</u>, 931 F.3d 610 (7th Cir. 2019) ........................................... 3

<u>Sigal v. Firtash</u>, No. 13-cv-7818, 2014 WL 4470426 (S.D.N.Y. Sept. 9, 2014) ........................... 9

<u>Sugar v. Greenburgh Eleven Union Free Schl. Dist.</u>, No. 18-cv-67,
    2018 WL 6830865 (S.D.N.Y. Dec. 28, 2018) ...................................................................... 5

<u>Szymczak v. Nissan N. Am., Inc.</u>, No. 10-cv-7493,
    2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) ................................................................. 9, 19

<u>Tatum v. Chrysler Grp. LLC</u>, No. 10-cv-4269,
    2012 WL 6026868 (D.N.J. Dec. 3, 2012) ........................................................................ 20, 21

<u>Todd v. XOOM Energy Md., LLC</u>, No. 15-cv-154,
    2016 WL 727108 (D. Md. Feb. 22, 2016) ............................................................................. 25

<u>Todd v. XOOM Energy Md., LLC</u>, No. 15-cv-154,
    2020 WL 1552769 (D. Md. Mar. 31, 2020) ......................................................... 10, 11, 21, 23

<u>Weaver v. N. Am. Power & Gas LLC</u>, No. 19-cv-1339,
    2020 WL 109163 (N.D. Ohio Jan. 9, 2020) ........................................................................ 12

<u>Willis v. Bank of Am. Corp.</u>, No. 13-cv-2615, 2014 WL 3829520 (D. Md. Aug. 1, 2014) ........ 22

<u>Wright v. Pubs. Clearing House, Inc.</u>, 439 F. Supp. 3d 102 (E.D.N.Y. 2020) ................ 19, 20, 21

<u>Zayas v. Adcor Indus., Inc.</u> No. 16-cv-3193, 2017 WL 4296721 (D. Md. Sept. 26, 2017.......... 18

## **Rules and Statutes**

9 U.S.C. § 3 ................................................................................................................................. 9

28 U.S.C. § 1404 ......................................................................................................................... 9

Fed. R. Civ. P. 12 ........................................................................................................................ 8

Md. Code Ann., Pub. Util. § 7-507 ................................................................................ 10, 11, 12

N.Y. Gen. Bus. Law § 349 .................................................................................................... 18, 20

**<u>Regulations</u>**

COMAR § 20.32.01.03 .................................................................................................... 11

COMAR § 20.32.01.04 .................................................................................................... 12

This case is the latest in a string of flawed putative class actions based on the theory that retail energy supply companies ("ESCOs") like Defendant Major Energy Electric Services, LLC ("Major"), which operate in deregulated energy marketplaces, are liable for charging rates higher than or allegedly not commensurate with the rates charged by *regulated* public utilities and wholesale prices for purchasing energy.  Here, that theory fails under Rule 12(b)(6), as it has in many prior cases, because Major promised Plaintiff Angela Glikin, a Maryland citizen, that its rates would "reflect market conditions."   In prolix fashion, Glikin attempts to limit the term "market conditions" to regulated utility rates, wholesale prices, and competitors' rates.  But the term is not so defined.  Rather, in setting its variable rates reflecting market conditions, Major was contractually entitled to consider "market pricing of commodity, transportation, *profit*, and other market price factors."  Major did *not* promise to match or beat regulated utility rates.  Major did *not* promise to base its variable rates solely on wholesale energy prices.  Major did *not* promise savings over the local utility or another ESCO.  Further, Glikin was free at all times to cancel her contract with Major without penalty.   As such, under binding Second Circuit authority, the principal theory of the Complaint fails as a matter of law.

Other deficiencies plague the Complaint.   First, all of Glikin's claims are subject to arbitration, as outlined in Major's contemporaneously filed Motion to Stay Pursuant to 9 U.S.C. § 3.   Second, given that Major supplied electricity to Glikin in Maryland, Glikin's claims are governed by Maryland law, which requires consumers to exhaust their administrative remedies in the Maryland Public Services Commission ("PSC") before filing an independent judicial action. Glikin did not do so.  Third, Glikin's eight purported claims against Major fail as a matter of law for the following reasons:

- **Count I Breach of Contract** – This claim fails because Glikin has not pled that Major breached the *actual* contract terms, *i.e.*, that the variable rates reflect "market conditions."

- **Count II Breach of the Implied Covenant of Good Faith and Fair Dealing** – This claim fails because Maryland law does not recognize this cause of action.

- **Count III New York General Business Law ("GBL") § 349 and Count IV GBL § 349(d)** – These claims fail because they lack a sufficient connection with New York and Glikin has not sufficiently alleged that Major engaged in deceptive conduct.

- **Count V Unfair and Deceptive Trade Practices, Count VI Maryland Consumer Protection Act ("MCPA"), and Count VII Fraud by Concealment** – These claims fail because Glikin has not sufficiently alleged that Major made an actionable misrepresentation or omission.

- **Count VIII Unjust Enrichment** – This claim fails because Glikin's claims are governed by an express contract and Glikin has alleged no duty independent of that contract.

For these reasons, the entirety of the Complaint is subject to dismissal.

## II.    BACKGROUND

Major formerly supplied electricity to Glikin, a Maryland citizen, in Maryland. Compl. ¶¶ 27, 92-93.[1] Glikin claims that Major is a New York company that processes enrollments and payments and conducts marketing and other services in New York. Id. ¶ 29.

### A.    Energy Deregulation Allows ESCOs to Supply Electricity to Consumers.

Maryland and other states have deregulated the energy supply services historically provided by utilities like Baltimore Gas & Electric ("BGE"), Glikin's utility. Id. ¶ 40. As such, a licensed ESCO may supply energy to consumers in deregulated states, with the utility still delivering the energy to the consumer. Id. ¶¶ 41-42. Consumers, however, may stay with their utility, which charges regulated prices, for both the delivery and supply of energy. Id. ¶ 42. In Maryland, utilities "manage billing" for all customers, regardless of whether an ESCO supplies the customer's energy, and the supply rate is set forth on the customer's monthly bill. Id. ¶¶ 42-43. Unlike utility rates, ESCO rates are not regulated by administrative agencies. Id. ¶ 53.

---

[1] Despite purporting to represent a class of consumers who were charged "a variable rate for electricity or gas by Major" (Compl. ¶ 155), Glikin alleges that Major supplied only electricity to her, not gas.

Despite acknowledging that ESCOs like Major may acquire "energy and incur associated costs" in different ways than utilities, Glikin claims that ESCO rates "should correlate with the utility's rates and over time should be roughly similar" because utility rates are based on PJM wholesale prices and ESCOs may (but are not required to) acquire energy in the same way as utilities.  Id. ¶ 86.  But, unlike utility rates, ESCO rates are not regulated.  As a result, the utility's rate "is not a market price at all; it is a regulated price."  Sevugan v. Direct Energy Servs., LLC, 931 F.3d 610, 616 (7th Cir. 2019); see also Richards v. Direct Energy Servs., LLC, 915 F.3d 88, 99 (2d Cir. 2019) ("[T]he entire point of electricity deregulation was to allow the [deregulated] market, rather than [the regulator], to determine rates.").  As such, Glikin's repeated allegations that utility rates "serve as perfect reflections of market conditions" and that utilities are somehow ESCOs' "primary competitors" are not plausible in light of binding precedent.  Compl. ¶¶ 48, 52.[2]

**B.     Glikin Enrolled with an ESCO in 2013, and Major Acquired her Account in 2018.**

**1.     Glikin Initially Enrolled with Entrust Energy in 2013.**

In 2013, Glikin enrolled with Entrust Energy for the supply of electricity on a fixed-rate plan.  Id. ¶ 8.  According to the Entrust Contract, Entrust promised to provide "written notification of the renewal terms at least 45 days prior to the renewal date" and that, if Glikin did not respond,

---

[2] Contravening Rule 8's requirement that a complaint contain "a short and plain statement of the claim," the Complaint contains a number of allegations that have no bearing on Major's supply of electricity to Glikin from April 2018 to January 2020.  See Compl. ¶¶ 38-39 (concerning another ESCO, not Major); see also id. ¶¶ 17-20, 32-34.  Glikin includes a number of allegations regarding the purported negative consequences of deregulation, none of which bear upon whether Major breached a contractual obligation owed to Glikin.  Compl. ¶¶ 55-81.  Also, although Glikin characterizes Major as a recalcitrant bad actor based on a Maryland PSC ruling, id. ¶¶ 35-37, she ignores the fact that Major remains a licensed ESCO in Maryland, see MD Electric Choice, *All Suppliers*, https://www.mdelectricchoice.com/shop/suppliers/ (last visited Apr. 4, 2021).

Glikin falsely alleges that, in a separate action, this Court found that Major "admitted 'in fact'" that it had "fraudulently marketed its services" and that "the evidence adduced" in separate litigation "demonstrates that [Major Energy] did." Id. ¶ 21.  What the Court actually said is: "The Indemnified Parties *allege* in the present action that [Major], under the leadership of Sellers, in fact fraudulently marketed its services *as alleged* in the Illinois Attorney General's Complaint, and that [the Indemnified Parties allege that] 'the evidence adduced' in the litigation 'demonstrates that it did.'" Major Energy Elec. Servs., LLC v. Horowitz, 2020 WL 4432121, at *4 (S.D.N.Y. July 31, 2020) (emphases added and citations omitted).  Allegations do not constitute admissions or judicial findings.

she would be transitioned to "a month-to-month Variable Rate Plan." Compl., Ex. A, at 3 ("Term" provision). The Variable Rate Plan is defined as: "The rate per kWh may be adjusted monthly to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors. Service continues on a month to month basis and may be cancelled by the Customer at any time without penalty." Id. ("Pricing Term").

### 2.   Entrust Assigned its Contract with Glikin to NG&E in 2016.

In May 2016, Entrust notified Glikin that it "will assign your electricity to National Gas & Electric, LLC ('NG&E')" after June 8, 2016. Compl., Ex. B. Entrust advised that NG&E "will honor your current agreement in place with Entrust" and that "[i]f you have a fixed rate plan with Entrust, your service will continue with the same fixed rate *until the end of your contract term* or upon cancellation." Id. (emphasis added).

Glikin pleads that, in October 2016, the term of her fixed-rate Entrust Contract expired, and her electricity account was "defaulted onto NG&E's variable rate plan in accordance with the [Entrust] Agreement." Compl. ¶ 9. Omitted from the Complaint is any reference to the July 21, 2016 letter that NG&E mailed to Glikin, notifying that her "contract is set to expire on 9/7/2016" and offering several renewal options, including doing nothing, which would result in her account moving from a fixed rate plan to a variable rate plan. See Declaration of Paul Konikowski, dated Apr. 1, 2021, attached as Exhibit A, at ¶¶ 6, 9, 12; Ex. 2 to NG&E Decl. Enclosed with that letter was a copy of NG&E's Terms of Service (the "NG&E Contract"), which provided the following explanation of NG&E's variable-rate plan: "The rate per kWh may be adjusted monthly to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors. Service continues on a month to month basis and may be cancelled by the Customer

4

at any time without penalty." Ex. 2 to Konikowski Decl., at ¶ 1.[3]   The NG&E Contract mailed to

Glikin also informed her that "[t]he supply price may not always provide a savings" and that her

service would continue "on a month to month basis and may be cancelled by the Customer at any

time without penalty." Id. at 7.  NG&E's July 21, 2016 letter also stated in bold letters that "there

is no limit on how much your rate may vary from one billing cycle to the next." Id. at 1.[4]

### 3.    NG&E Assigned its Contract with Glikin to Major in 2018.

On March 14, 2018, NG&E and Major jointly sent a letter to Glikin, notifying her that

NG&E "will assign your ELECTRIC service to Major" in April 2018.  Compl. ¶¶ 10, 88; Compl.,

Ex. C.  That letter notified Glikin that Major "will honor your current agreement in place with

National Gas & Electric" and that NG&E variable-rate customers like her would "continue under

the same variable ELECTRIC rate."  Compl., Ex. C.  That letter also stated that Major's

"experience in deregulated energy markets enables [it] to offer competitive prices." Id. at 1.

Although Glikin claims that Major began "price gouging her" after Major began supplying

her electricity, she alleges that she did not "realize" this until January 2020, when she canceled her

services with Major. Compl. ¶¶ 92-93.  Despite those allegations, Glikin admits, as she must, that

the rate charged by Major was set forth on her monthly electricity bills. Id. ¶¶ 42-43.  She also

was free to cancel her services with Major at any time without penalty.  See NG&E Contract,

---

[3] Courts assessing Rule 12 motions may consider documents deemed "integral" to the complaint. Sugar v. Greenburgh Eleven Union Free Schl. Dist., 2018 WL 6830865, at *3 (S.D.N.Y. Dec. 28, 2018) (Briccetti, J.).  "A document is integral to the complaint where the plaintiff (1) has actual notice of the document and its information and (2) has relied upon the documents in framing the complaint." Id. at *4 (citations, quotation marks, and brackets omitted).  Major submits that NG&E's July 21, 2016 letter and the NG&E Contract are integral to the Complaint because Glikin acknowledges that her electricity account was assigned to NG&E and that NG&E began charging her a variable rate after the fixed-rate initial term of her Entrust Contract expired.  Further, Major attached a copy of NG&E's July 21, 2016 letter and the NG&E Contract to its response to Glikin's pre-litigation demand letter under the Massachusetts Consumer Protection Act, which Glikin references in the Complaint. Compl. ¶ 202.  In any event, the variable-rate pricing language in the Entrust Contract is identical to the variable-rate pricing language in the NG&E Contract.  As such, in assessing whether Glikin has sufficiently pled that Major breached the promise to charge a variable rate reflecting market conditions, the Court may look to the price term of either the Entrust Contact or the NG&E Contract.

[4] As discussed in Major's Motion to Stay Pursuant to 9 U.S.C. § 3, the NG&E Contract, which was assigned to Major, contains a mandatory arbitration provision and class action waiver.  See Ex. 2 to Konikowski Decl., at ¶¶ 11-12.

attached as Ex. 2 to Konikowski Decl., at ¶ 1 ("Service continues on a month to month basis and may be cancelled by the Customer at any time without penalty.").[5]

## C.    Glikin's Claims against Major Are Not Based on the Contract Terms at Issue.

Glikin claims that Major failed to disclose information about its rates and that its promise to charge rates that "reflect market conditions" and statement about "competitive" rates are false. Compl. ¶¶ 11-12. Given that she alleges that her contract with Major is "valid," Major's actual contractual promises, not Glikin's mischaracterizations of them, must be assessed. Id. ¶¶ 167, 174.[6] Although "market conditions" is defined to include "market pricing of commodity, transportation, profit, and other market price factors," Glikin tries to limit "market conditions" to mean utility rates, wholesale prices, competitors' rates, and Major's introductory rates.

Glikin principally complains that Major breached its contract and engaged in deceptive conduct by charging rates that were "higher than Plaintiff's local utility rates" and did not fluctuate in the same manner as BGE's rates and by not disclosing that its rates were higher than BGE's. Id. ¶¶ 11, 96, 98, 102, 111, 137, 142.  Glikin also claims that Major's statement that it charges "competitive" rates constitutes a promise to charge rates in line with BGE's rates and "wholesale costs of energy." Id.¨¶¶ 94-95, 106.  But Glikin points to no contractual term or extracontractual statement promising rates lower than or that directly correspond with utility rates or wholesale costs.  Further, despite pleading that Major and BGE do not acquire energy in the same manner and, thus, incur different costs, Glikin baldly alleges that Major's rates are unreasonable because Major should be able to procure electricity at a lower cost than utilities. Id. ¶¶ 48-49, 104.

---

[5] The Entrust Contract, upon which Glikin relies, also states that "[s]ervice continues on a month to month basis and may be cancelled by the Customer at any time without penalty."  Compl., Ex. A, at 3 ("Pricing" term).

[6] The Complaint also alleges that Major's "marketing, advertising, [and] promotion[s]" contain misrepresentations, Compl. ¶ 147, but is devoid of facts regarding the content or distribution of any marketing, advertising, or promotional materials, apart from the March 14, 2018 letter sent to Glikin.  Glikin does not plead that she received, encountered, read, or relied on any other marketing, advertising, or promotional materials of Major.

Glikin also alleges that Major breached its contract and engaged in deceptive conduct by charging rates that did not reflect wholesale energy prices and did not fluctuate in the same manner as wholesale prices.  Id. ¶¶ 104, 118, 121-22.  Glikin, however, points to no contractual provision or extracontractual statement promising rates that reflected or tracked solely wholesale prices.

Next, Glikin claims that U.S. Energy Information Administration ("EIA") data purportedly shows that Major's rates were higher than other ESCOs in Maryland.  Id. ¶¶ 11, 115-16.  Glikin, however, admits that the EIA data aggregates "both fixed and variable rates."  Id. ¶ 116.  Thus, the average prices set forth in that data are not an adequate comparator for assessing the reasonableness or competitiveness of the *variable* rates that Glikin was charged from April 2018 to January 2020.

Glikin also alleges that Major is liable for charging her variable rates from April 2018 to January 2020 that are higher than fixed and introductory rates that Major presently offers to customers, claiming that nothing justifies this purported price disparity.  Id. ¶¶ 110, 112.  Major, however, never charged a fixed or introductory rate to Glikin, and the *fixed* rates it *presently* offers or charges have no bearing on the *variable* rates that Major *previously* charged Glikin.

Finally, Glikin claims that Major did not disclose certain information, such as advanced notice of its variable rates, the methodology used to set its variable rates, or the conditions that would result in customers saving money.  Id. ¶¶ 108, 111.  But Glikin points to no requirements obligating Major to provide advanced notice of its rates or a more specific methodology.  Also, Glikin points to no contractual provision or extracontractual statement promising savings.

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(1) Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  J.T. v. de

Blasio, --- F. Supp. 3d ----, 2020 WL 6748484, at *41 (S.D.N.Y. Nov. 13, 2020) (citing Fed. R.

Civ. P. 12(b)(1)).   "If a plaintiff has failed to meet the exhaustion [of administrative remedies]

requirement, the district court does not have subject-matter jurisdiction over the action."  I.S. v.

Binghamton City Schl. Dist., 486 F. Supp. 3d 575, 593 (N.D.N.Y. 2020).

**B.      Rule 12(b)(6) Standard**

In deciding a Rule 12(b)(6) motion, "the Court evaluates the sufficiency of the complaint

under [a] 'two-pronged approach.'"  Gerard v. Traffic Safety, LLC, 2012 WL 2866255, at *1

(S.D.N.Y. July 2, 2012) (Briccetti, J.).   "First, threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, are not entitled to the assumption of truth and

thus are not sufficient to withstand a motion to dismiss."  Id. (citation and internal quotation marks

omitted).  Second, well-pled allegations are accepted as true.  Id.  But the allegations "must meet

a standard of 'plausibility.'"  Id. at *2 (citations omitted).  A claim is plausible "'when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.'"  Id. (citation omitted).  Also, fraud claims must be pled with

particularity.  Cohen v. Hertz Corp., 2013 WL 9450421, at *4 (S.D.N.Y. Nov. 26, 2013).

**C.      Choice-of-Law Standard**

Maryland law applies because the NG&E Contract, which was assigned to Major in 2018,

contains a Maryland choice-of-law provision.   See Ex. 2 to Konikowski Decl., at ¶ 13(c).[7]

Moreover, under New York choice-of-law rules, Maryland law applies to Glikin's claims.  See

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941) (holding that courts apply the

choice-of-law rules of the forum state in diversity cases).   "New York uses an interest-analysis

approach to choice of law: the law of the jurisdiction with the greatest interest usually applies."

---

[7] The Entrust Contract also contains a Maryland choice-of-law provision.  See Compl., Ex. A, at 4.

Kashef v. BNP Paribas SA, 442 F. Supp. 3d 809, 817 (S.D.N.Y. 2020).  This "interest analysis" applies "to choice of law in tort [claims] in New York," such as Glikin's fraud-based and unjust enrichment claims.  GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d Cir. 2006); see also Sigal v. Firtash, 2014 WL 4470426, at *7 (S.D.N.Y. Sept. 9, 2014) (fraud and unjust enrichment claims considered tort claims for choice-of-law purposes).  Further, courts in multistate putative class actions generally apply the law of the buyer's domicile.  See Szymczak v. Nissan N. Am. Inc., 2011 WL 7095432, at *12 (S.D.N.Y. Dec. 16, 2011) ("States have no interest in applying their consumer protection statutes to buyers who live out of state and whose purchases occur out of state.").  Glikin admits that she is a Maryland resident and was supplied electricity in Maryland.  Compl. ¶¶ 8, 27.  Thus, Maryland law applies to Glikin's tort claims.

Courts apply a "center of gravity" or "grouping of contacts" approach to contract claims under which they "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties."  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997).  At the pleading stage, courts hold that non-New York plaintiffs who purchased the defendant's product outside of New York cannot bring contract claims under New York law.  In re Frito-Lay N. Am, Inc. All Natural Litig., 2013 WL 4647512, at *19 (E.D.N.Y. Aug. 29, 2013).  Given that Glikin is a Maryland resident, who received electricity in Maryland under a contract she accepted in Maryland, Maryland law applies to her contract claims.

## III.   ARGUMENT

### A.   Glikin's Claims Are Subject to Arbitration or, in the Alternative, Transfer.

At the outset, Glikin's claims are subject to arbitration pursuant to the terms of the NG&E Contract, which was assigned to Major in 2018.  That argument is set forth in Major's Motion to

Stay Pursuant to 9 U.S.C. § 3 or, in the Alternative, Motion to Transfer Venue.  In the alternative,

Glikin's initial Entrust Contract, upon which she relies in the Complaint, contains a forum-

selection clause specifying that "[v]enue for any lawsuit brought to enforce any term or condition

of this Agreement or to construe the terms hereof shall lie exclusively in the State of Maryland."

Compl., Ex. A, at 2 ("Choice of Laws" term).  Accordingly, should the Court accept Glikin's

allegation that the Entrust Contract was assigned to Major and is the operative contract (which

Major disputes), Major requests that this action be transferred to the U.S. District Court for the

District of Maryland pursuant to 28 U.S.C. § 1404(a).[8]  Given that these issues implicate threshold

matters regarding the proper forum for this dispute (which is not this Court under either the Entrust

Contract or the NG&E Contract), Major submits that the Court need not address the below Rule

12 arguments should it grant Major's requests for relief under 9 U.S.C. § 3 or 28 U.S.C. § 1404.

**B.**      **This Action Is Subject to Dismissal for Failure to Exhaust Administrative Remedies.**

Dismissal is appropriate because Glikin failed to exhaust her administrative remedies under

Maryland law.  In <u>Todd v. XOOM Energy Maryland, LLC</u>, 2020 WL 1552769 (D. Md. Mar. 31,

2020), the District of Maryland recently dismissed MCPA, fraud, and contract claims against an

ESCO on exhaustion grounds.  There, the court held that "claims against electricity suppliers for

violating consumer protection laws or engaging in fraudulent or deceptive conduct are plainly

within the [Maryland Public Service] Commission's jurisdiction" and explained:

> § 7-507 of the Public Utilities Article prohibits electricity suppliers from
> operating in Maryland without a Commission-issued license and empowers the
> Commission to revoke or suspend a license for "just cause."  "Just cause" for
> sanctions against an energy supplier – which may be raised "on the
> Commission's own investigation or on complaint of the Office of Peoples'

---

[8] Major does not concede or argue that the Entrust Contract controls.  But Glikin does, so she, under her own theory, was obligated to file her claims in Maryland.  Major is not "precluded from invoking [the venue] provision[] of the contract" in the alternative, even though it contends that the Entrust Contract does not control.  <u>Contacare, USA, Inc. v. Labs. Contapharm</u>, 1986 WL 3504, at *2 (W.D.N.Y. Mar. 20, 1986).  In the transferee forum, Major can raise the defenses available to it, including this argument that the NG&E Contract, not the Entrust Contract, is applicable.

> Counsel, the Attorney General, or an affected party" – may include "committing fraud or engaging in deceptive practices;" and "violating a provision of this article or any other applicable consumer protection law of the State."

Id. at *6 (citations omitted).  Relying on Bell Atl. of Md. v. Intercom Systems, 782 A.2d 791 (Md. 2001), and McCoy v. Pepco Holdings, 2016 WL 8678000 (D. Md. June 10, 2006), the Todd court held that one of the plaintiffs "was required to begin her search for redress with the Commission before joining this litigation" and dismissed her claims "on exhaustion grounds." Id. at *7.

The Bell Atlantic court held that, although the PSC "only had primary rather than exclusive jurisdiction over consumer complaints," "consumers must exhaust their administrative remedies before proceeding with an independent judicial action" and that "where a matter involves those areas within the jurisdiction of the PSC, either in whole or in part, a party may not circumvent the administrative agency's review simply by filing an independent judicial action seeking compensatory and punitive damages." 782 A.2d at 805-06.  The court stated that "a consumer first must file a complaint with the PSC and then may decide to file an independent judicial action," which the court must stay on request until the administrative case is resolved.  Id. at 806-07.

Applying Bell Atlantic, the McCoy court found that the plaintiff's suit against his electric company "involve[d] issues that [fell] within the Commission's jurisdiction," specifically "issues regarding billing disputes and termination of services" and fraud allegations.  2016 WL 8678000, at *2-3.  "Plaintiff was therefore required to initiate such a dispute with the Commission, before filing an independent judicial action in this Court." Id. at *3.  Given that there was "no allegation . . . indicating that Plaintiff did so," the court granted the defendant's motion to dismiss.  Id.

Also, the PSC's amended 2016 regulations provide that "[a] customer shall initially submit any inquiry or dispute directly to a . . . supplier . . . for resolution."  COMAR § 20.32.01.03.A.[9]

---

[9] The Todd court acknowledged the 2016 amended regulations but found that they did not apply to the plaintiff's claims because she brought suit in 2015.  2020 WL 1552769, at *7 n.4.  Regardless, the plaintiff's claims were still

"If a customer contacts the Commission or its staff before contacting the . . . supplier . . . the customer shall be advised of Regulation .03 of this chapter and referred to the . . . supplier . . . ." Id. § 20.32.01.04.B.[10]  If the customer disputes the supplier's proposed resolution, the customer "may submit an inquiry to the Commission within 7 days of receipt of the determination."  Id. § 20.32.01.04.A.  Thus, the PSC's regulations provide a process for the resolution of disputes with ESCOs, which must precede any judicial action.  Glikin does not allege that she complied with these procedures before bringing suit against Major.

Glikin claims that Major breached its contract and engaged in deceptive and fraudulent conduct by allegedly charging excessive rates.  These are precisely the types of allegations over which the PSC has jurisdiction and that are subject to the PSC's regulations.  Glikin must proceed through the PSC's required administrative process before any court "can properly adjudicate the merits of the alternative judicial remedy."  McCoy, 2016 WL 8678000, at *2.  As in McCoy, the Complaint here has no allegation that Glikin exhausted her administrative remedies.  Thus, Glikin's claims are subject to dismissal for failure to exhaust her administrative remedies.[11]

## C.    Glikin's Claims against Major Fail as a Matter of Law.

Given that Glikin cannot pursue her claims in this Court for the reasons discussed above, this Court need not assess whether Glikin has sufficiently pled her eight purported claims against Major.  Nevertheless, all of those claims are subject to dismissal under Rule 12(b)(6).

---

dismissed because they fell "within the statutory jurisdiction of the Commission – existing at the time she filed – to hear complaints about electricity suppliers.  For that reason, [the plaintiff] was required to first bring her claims against [the ESCO] in a complaint to the Commission."  Id. (citing Md. Code, Pub. Util. § 7-507(k)(1)).

[10] See also Md. PSC, Retail Energy Supplier Complaint Reports, https://www.psc.state.md.us/retail-energy-supplier-complaint-reports/ ("Prior to contacting [the PSC's Consumer Affairs Division], the customer must have contacted the company first for investigation and resolution (COMAR 20.32.01.03(a))." ) (last visited Apr. 4, 2021).

[11] Ohio law is in accordance with Maryland law on this issue.  See Weaver v. N. Am. Power & Gas Co., 2020 WL 109163 (N.D. Ohio Jan. 9, 2020) (dismissing claims against ESCO under Rule 12(b)(1) because the regulatory agency had jurisdiction over the claims).

1.     **Glikin's Claim for Breach of Contract (Count I) Fails.**

Glikin's claim for breach of contract is subject to dismissal because no allegations plausibly suggest a breach.  "It is well-established in Maryland that a complaint alleging breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by the defendant.'"  RRC Ne., LLC v. BAA Md., Inc., 994 A.2d 430, 440 (Md. 2010) (emphasis in original and citation omitted).  Although Glikin makes a number of assertions of bad faith against Major, this claim fails because she does not allege that Major breached an actual contract term.

Here, the price term in both the NG&E Contract (which Major asserts is operative) and the Entrust Contract (on which Glikin relies) stated that Glikin would be charged a variable rate, which "may be adjusted monthly to reflect market conditions, including market pricing of commodity, transportation, profit, and other market price factors."  Glikin admits that she received just that: a rate that varied from month to month.  Nevertheless, she claims that Major breached the contract by not charging a variable rate "competitive with local wholesale and competing retail energy rates."  Compl. ¶ 168.  The only allegations pled in support of this theory are Glikin's comparisons of the variable rates Major charged her with: BGE's regulated rates; wholesale prices; EIA data aggregating Maryland ESCOs' average variable and fixed rates; and Major's presently offered fixed rates.  Major was not contractually obligated to charge rates matching or tracking these alleged comparators.  Without such express promises, these allegations do not support a breach.

Further, BGE's regulated rates, wholesale prices, Major's presently offered fixed retail rates, and the average ESCO prices (blending fixed *and* variable retail rates) referenced in the EIA data are not valid comparators for assessing whether Major's variable rates were based on "market conditions."  With respect to utility rates, the Second Circuit and other courts have recognized the

key difference between such rates and the rates charged by ESCOs like Major, a classic apples-to-oranges comparison.  In <u>Richards</u>, the Second Circuit rejected the assertion that an ESCO may be held liable for breach of a promise to set rates "based upon business and market conditions" because it charged rates untethered to the utility, characterizing such a claim as "near frivolous":

> If we were to hold private electricity suppliers liable for departing from the [utility rates], we would in effect make those [regulator]-approved rates binding on private electricity suppliers like Direct Energy. Yet the entire point of electricity deregulation was to allow the market, rather than [the regulator], to determine rates. Richards's near frivolous contract claim provides no basis on which a court is authorized to overrule this policy choice.

915 F.3d at 99.  The Second Circuit observed that, "[a]s a matter of plain meaning," the term "business and market conditions" contemplates considerations of "achiev[ing] a target profit margin, match[ing] competitors' prices, and reduc[ing] customer losses, among other objectives." <u>Id.</u> at 98 (citing Black's Law Dictionary (10th ed. 2014)).  Although <u>Richards</u> affirmed a summary judgment decision, the Court recognized that "[c]ourts across the country have [] rightly dismissed arguments like Richards's even at the pleadings phase." <u>Id.</u> & n.6 (collecting cases).[12]

Applying <u>Richards</u>, one district court in this Circuit recently dismissed a plaintiff's claims against Just Energy, finding, *inter alia*, that the plaintiff failed to allege that Just Energy breached its promise to charge variable rates "according to business and market conditions." <u>Nieves v. Just</u>

---

[12] Indeed, many courts have found that the charging of rates higher than those charged by the utility does not suggest that an ESCO failed to set prices based on market conditions.  <u>See</u> <u>Orange v. Starion Energy PA, Inc.</u>, 711 F. App'x 681, 683 (3d Cir. 2017) (finding allegations that ESCO's rate was triple that of the utility rate did not state a claim); <u>Marshall v. Verde Energy USA, Inc.</u>, 2019 WL 6975424, at *5 (D.N.J. Dec. 19, 2019) (dismissing claims against ESCO where the plaintiff did not show that the ESCO "failed to base its rates on market conditions, alleging only that [its] rates did not track" utility rates or "wholesale costs"); <u>Marshall</u>, 2020 WL 5905072 (D.N.J. Oct. 5, 2010) (dismissing amended contract claim where Marshall "took an unduly restrictive view of the phrase 'market conditions,' and alleged only that Verde did not vary its rates according to comparable pricing, namely, [utility] rates and wholesale costs"); <u>Hamlen v. Gateway Energy Servs. Corp.</u>, 2017 WL 892399, at *4 (S.D.N.Y. Mar. 6, 2017) ("That defendant's rates do not track wholesale or competitors' rates is not sufficient to allege a breach of the contract."); <u>Lane v. Direct Energy Servs., LLC</u>, 2020 WL 3211435 (S.D. Ill. June 15, 2020) (dismissing contract claims where plaintiff relied on comparisons of ESCO's rates with utility rates and wholesale price); <u>Coda v. Constellation Energy Power Choice, LLC</u>, 2018 WL 3201796, at *8 (D.N.J. June 29, 2018) ("Plaintiff's attempt to use wholesale prices as the overriding factor to support its breach of contract is not viable because the Variable-Rate Factors [in the contract] are not so limited.").

14

Energy N.Y. Corp., 2020 WL 6803056 (W.D.N.Y. Nov. 19, 2020).  Nieves rejected the argument

that utility rates are proper comparators for assessing ESCO rates and held that the term "business

and market conditions" did not require Just Energy to base its rates on wholesale costs,

competitors' pricing, or utility rates because "[n]othing in the text of the provision mandates

particular items as business or market conditions."  Id. at *4.  Nieves made clear that "business

and market conditions" cannot be so "confined" "absent language in the contract to the contrary."

Id.  Thus, it found cases denying motions to dismiss, which involved more limited definitions of

business and/or market conditions, to lack "persuasive value."  Id.

Here, like in Nieves, "market conditions" is not limited to consideration of such factors as

utility rates or wholesale prices.  Although the contract at issue identifies "market pricing of

commodity" as an example of a factor that may be taken into account, the contract does not limit

"market conditions" to that factor.  To the contrary, the contract here expressly states that "market

conditions" includes other similarly non-exclusive examples, such as "profit" and "other market

price factors."  None of these considerations required Major to match or track regulated utility

rates or wholesale prices.  Nevertheless, Glikin seeks damages because the variable rates she was

charged did not match, beat, or move in line with BGE's regulated rates – the very argument that

the Second Circuit and district courts in this Circuit have rejected.[13]

Next, Glikin alleges that the variable rates Major charged her were not based on market

conditions because they exceeded introductory and fixed rates currently offered by Major.  Compl.

¶¶ 110, 112.  Even if Major's *current* introductory and fixed-rate offerings had bearing on the

reasonableness of the *variable* rates it charged Glikin from April 2018 to January 2020, which they

---

[13] Notably, the NG&E Contract, which was assigned to Major, expressly stated that savings were not guaranteed.  Ex. 2 to Konikowski Decl., at 7.  Moreover, the Entrust Contract, upon which Glikin relies, did not promise savings over the utility.  See Marshall, 2019 WL 1254562, at *4 (noting that the ESCO contract did "not guarantee savings" in dismissing breach of contract claim).

do not, the Second Circuit has rejected plaintiffs' attempts to compare ESCOs' variable and fixed rate offerings.  In <u>Richards</u>, Richards argued that Direct Energy acted improperly by "luring new customers by offering low fixed teaser rates" but then charging higher variable prices after the fixed-rate term expired.  915 F.3d at 99, 102 (internal ellipses omitted).  Similarly, here, Glikin alleges that Major improperly charged variable rates higher than its current fixed-rate offerings because "there is no material difference between the costs Major Energy incurs for its fixed rate customers and those it incurs for its variable rate customers."  Compl. ¶ 112.  But, under <u>Richards</u>, there is nothing wrong with charging higher rates after a lower, introductory price because such "quotidian pricing practices" are "mainstream across numerous sectors of American commerce":

> Presumably, what bothers Richards is that many Direct Energy consumers pay the variable rate when their initial fixed-rate periods expire, even though leaving their contracts would likely save them money.  But this is just an example of "status quo bias": a general tendency by people to "stick with their current situation."  All sorts of companies design their business strategies with the expectation that consumers act this way.  Many magazines and gyms, for example, offer initial discounts on subscriptions and membership on the assumption that they can make up the loss if customers either decide they like the product or, crucially, forget to cancel.

915 F.3d at 103-04 (internal citations omitted), 104 n.10.   Thus, Major's current fixed-rate offerings provide no insight into the reasonableness of the variable rates charged to Glikin.

In another effort to plead that Major's variable rates did not reflect market conditions, Glikin cites EIA data allegedly showing that Major charged higher variable rates than other ESCOs in Maryland.  But Glikin admits that the EIA data aggregates "both fixed and variable rates."  Compl. ¶¶ 115-16.  As such, "those figures lead to a problem."  <u>Lane</u>, 2020 WL 7443153, at *3.  Given that each ESCO's average price "includes both fixed and variable rates," the "use [of] those average rates of other [ESCOs] to compare to [Glikin's] variable rate" is improper.  <u>Id.</u>  The EIA data shows only that competitors offering higher and lower prices were always available to Glikin.

Finally, to the extent that Glikin claims that the reference to "competitive prices" in Major's March 14, 2018 letter, notifying her of the assignment from NG&E, represents a contractual promise, any claim that Major is liable for not charging "competitive prices" is deficient. "Maryland law distinguishes between statements that relate to material fact – which may give rise to cognizable claims – and vague generalities, statements of opinion, or puffery – which are deemed non-cognizable." Daniyan v. Viridian Energy LLC, 2015 WL 4031752, at *2 (D. Md. June 30, 2015). Statements about competitiveness are nonactionable puffery. See id. ("Viridian's generalized statements that its energy is competitively priced . . . amount to nothing more than vague generalities and puffery."); Corsale v. Sperian Energy Corp., 412 F. Supp. 3d 556, 563 (W.D. Pa. 2019) ("Plaintiffs allege only that Defendant Sperian Energy advertised that it offers 'competitive' rates – but such a vague claim of 'competitive' rates is puffery and, therefore, not actionable."); Marshall, 2019 WL 6975424, at *4 ("Claims of 'substantial savings,' 'low competitive rates,' 'exceptional value,' and 'great savings' are not actionable"). Thus, Major's statement regarding competitive prices constitutes nonactionable puffery.

Glikin also does not plead facts suggesting that Major's rates were not competitive. Indeed, as discussed, the Complaint contains no valid comparator against which to assess Major's rates. Glikin relies on BGE's regulated rates, wholesale prices, Major's current fixed-rate offerings, and the inadequate EIA data. None of these comparators is valid for assessing whether the variable rates Major charged Glikin reflected market conditions or were competitive in the deregulated marketplace at the time they were charged. Thus, Glikin's contract claim fails as a matter of law.

## 2. Glikin's Good Faith and Fair Dealing Claim (Count II) Fails.

Glikin's implied covenant claim is deficient because "Maryland does not recognize a separate cause of action for the breach of implied duty of good faith and fair dealing." Eaglehead

Corp. v. Cambridge Capital Grp., Inc., 170 F. Supp. 2d 552, 562 (D. Md. 2001); see also Zayas v. Adcor Indus., Inc., 2017 WL 4296721, at *9 (D. Md. Sept. 26, 2017) (dismissing implied covenant claim because it "is not an independent cause of action in Maryland"); Mt. Vernon Props., LLC v. Branch Banking & Trust Co., 907 A.2d 373, 381 (Md. Ct. App. 2006) (same).  In Maryland, the implied covenant of good faith and fair dealing "'simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.'"  Eaglehead Corp., 170 F. Supp. 2d at 562 (citation omitted).  Here, Glikin alleges no facts suggesting that Major acted to prevent her from performing under the contract.[14]

Given that Maryland does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing, Glikin's claim fails as a matter of law.

### 3.   Glikin's GBL Claims (Counts III and IV) Fail for Lack of Standing.

Glikin's GBL claims are deficient because Glikin lacks standing.[15]   Section 349 "unambiguously evinces a legislative intent to address commercial misconduct occurring within New York" such that "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York."  Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190, 1195-96 (N.Y. 2002).  Indeed, this Court recently dismissed a GBL claim where the complaint "merely allege[d] that [the plaintiff] is a citizen of New York and fails to make any allegations about where he was

---

[14] In any event, the implied covenant claim is duplicative of Glikin's claim for breach of contract.  In support of her contract claim, Glikin alleges that Major failed to "charge a variable rate reflective of market conditions, i.e., a rate competitive with local wholesale and competing retail energy rates."  Compl. ¶ 168.  Similarly, in support of her implied covenant claim, Glikin alleges that she "reasonably expected" that Major would charge variable rates that "reflect the wholesale and retail market prices for energy."  Id. ¶ 177.  In support of both claims, Glikin claims that she sustained damages based on the amounts Major charged her.  Id. ¶¶ 171-72, 178-79.  Given that these claims seek identical damages based on the same alleged facts, the implied covenant claim, even if independently cognizable under Maryland law, is subject to dismissal as duplicative of Glikin's claim for breach of contract.

[15] Although Glikin purports to bring these claims on behalf of a Multistate Class and a State Class, which include putative class members located in New York, "[a]t this preliminary stage of the litigation, the only relevant standing inquiry is that of the named plaintiffs."  In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig., 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010).

exposed to allegedly deceptive materials or purchased [the defendant's] Products." McVetty v. TomTom N. Am., Inc., 2021 WL 965239, at *3 (S.D.N.Y. Mar. 13, 2021).

In an attempt to bypass this barrier to recovery, Glikin, a *Maryland* resident who was supplied electricity *in Maryland*, alleges that Major processed enrollments and payments in New York, directed marketing, billing, and customer outreach efforts from New York, and received payments in New York. Compl. ¶ 29. These allegations are insufficient to permit Glikin to seek relief under the GBL because Glikin never resided in New York, was not supplied electricity there, and does not allege that she was "exposed to allegedly deceptive materials" or purchased her supply portion of electricity there. McVetty, 2021 WL 965239, at *3. Indeed, "to qualify as a prohibited act under the [GBL], *the deception of a consumer must occur in New York*." Goshen, 774 N.E.2d at 1195 (emphasis added); see also Szymczak, 2011 WL 7095432, at *12 (dismissing GBL claims of "those plaintiffs who did not purchase their automobiles in New York because the relevant statutes do not apply to transactions occurring outside the state") (Briccetti, J.). Glikin alleges no facts suggesting that she was in any way deceived in New York or purchased the supply portion of the electricity for her Maryland residence in New York.

Although the Second Circuit has "recognized that post-Goshen case law evolved to 'focus on the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction, rather than on the residency of the parties,'" the extraterritorial reach of the GBL cannot be extended here because Glikin has not pled that "some part of the underlying transaction occurred in New York State." Wright v. Pubs. Clearing House, Inc., 439 F. Supp. 3d 102, 110 (E.D.N.Y. 2020) (quoting Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 122, 124 (2d Cir. 2013)). Glikin pleads only that Major processed enrollments and payments in New York and directed marketing, billing, and customer outreach efforts from there. Compl. ¶ 29. But

19

she admits that her bills were processed and delivered by BGE, not Major, in Maryland and that

her enrollment with Major was the result of the assignment of her electricity account from NG&E,

not her exposure to marketing or customer outreach efforts from Major.  Id. ¶¶ 42, 88.

Glikin is not entitled to invoke the GBL merely because Major allegedly conducted

business from New York, as such allegations are "merely clever re-articulations of the allegation

that the Defendants operate their principal place of business in New York."  Wright, 439 F. Supp.

3d at 110 (dismissing § 349 claim where plaintiff alleged defendant "hatched the deceptive scheme

in New York, sent the relevant advertising materials from New York, and received payment and

processed orders in New York" because those allegations "only establish the location of some

clerical aspects of the Defendant's business").  Moreover, "[i]t is well-settled that a purchaser does

not have standing to bring a Section 349 claim just because he or she transacted with a seller who

resides in New York."  Id. (collecting cases).   Here, Glikin resided in Maryland and was supplied

electricity there.  Compl. ¶¶ 8, 83.  Further, Glikin's contract with NG&E that was assigned to

Major contains a Maryland choice-of-law provision.  Glikin's initial contract with Entrust also

contains a Maryland choice-of-law provision.  Thus, Glikin cannot bring claims under the GBL

against Major.  Even if Glikin could assert GBL claims against Major, those claims fail because

Glikin has not sufficiently alleged that Major engaged in deceptive conduct, as discussed below.

### 4. Glikin's Unfair and Deceptive Acts and Practices (Count V), MCPA (Count VI), and Fraud by Concealment (Count VII) Claims Fail.

Glikin purports to bring a claim under the MCPA in Count VI of the Complaint.  Glikin, a

Maryland citizen and the sole named plaintiff, also seeks to bring claims under the GBL in Counts

III and IV (discussed above) and claims for "unfair and deceptive acts and practices" under the

laws of each state where Major does business (Count V).  "On a motion to dismiss a putative class

action complaint, the Court may only consider the allegations of the named plaintiffs, and not the

generalized allegations of unnamed plaintiffs or putative class members." Tatum v. Chrysler Grp.

LLC, 2012 WL 6026868, at *4 (D.N.J. 2012); see also Chambers v. Am. Trans Air, 17 F.3d 998,

1006 (7th Cir. 1994) (holding that a plaintiff must have an "individual cause of action" in order to

represent a class).  Because no class has been certified, Major requests that the Court only consider

the consumer protection claims purported to be asserted in Counts III, IV, V, and VI under the

MCPA, the statute enacted to provide protections to Maryland consumers like Glikin.  See Crissen

v. Gupta, 994 F. Supp. 2d 937, 946 (S.D. Ind. 2014) ("[A] named plaintiff must have a valid cause

of action against each defendant, and cannot rely on the allegations of putative class members if

he or she does not also have a claim against that defendant.").[16]

The MCPA prohibits the use of "any unfair, abusive, or deceptive trade practice" in "[t]he

sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer

services." Todd, 2020 WL 1552769, at *22.  "Specifically, the MCPA prohibits both the use of

false or misleading statements and the omission of material facts.  To bring an action under the

MCPA, the plaintiff must allege '(1) an unfair or deceptive practice or misrepresentation that (2)

is relied upon and (3) causes [her] actual injury." Daniyan, 2015 WL 4031752, at *1.[17]

Glikin's fraud-by-concealment claim under Maryland law shares similar essential

elements.  Glikin must plead that: (1) Major owed a duty to her to disclose a material fact; (2)

Major failed to disclose that fact; (3) Major intended to defraud or deceive the plaintiff; (4) Glikin

took action in justifiable reliance on the concealment; and (5) Glikin suffered damages as a result

---

[16] As discussed above, Glikin lacks standing to assert individual claims under the GBL.  She also lacks standing to
assert individual claims under the other state consumer protection statutes referenced in paragraph 201 of the
Complaint.  In any event, Glikin pleads that there is no conflict between these statutes and the MCPA.  Compl. at pg.
60 n.62.  As such, the Court need only assess the sufficiency of Glikin's MCPA claim.

[17] Similarly, to state a claim under GBL §§ 349 and 349-d, a plaintiff "'must allege that a defendant has engaged in
(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the
allegedly deceptive act or practice.'" Wright, 439 F. Supp. 3d at 109 (citation omitted); see also Progressive Mgmt.
of N.Y. v. Galaxy Energy LLC, 2016 WL 1228126, at *8 (N.Y. Sup. Ct. Mar. 28, 2016) ("It has been held that section
349(d)(3) has the same elements as section 349(a).").

of the defendant's concealment.  <u>Kiddie Academy Domestic Franchising, LLC v. Wonder World Learning, LLC</u>, 2019 WL 1441812, at *19 (D. Md. Mar. 31, 2019).

These claims fail for the same reasons.  First, Glikin cannot point to a specific representation by Major that is false or misleading.  She alleges that Major "falsely represented" that variable-rate customers would save money and that its variable rates corresponded to market pricing by stating that "Major Energy's team's experience in deregulated energy markets enables them to offer competitive prices."  Compl. ¶¶ 209(g)-(h), 213(g)-(h).  But statements regarding "competitive pricing" constitute puffery that is not actionable under consumer-protection statutes.  <u>See</u> <u>Daniyan</u>, 2015 WL 4031752, at *2 (denying MCPA claim based on statements of low prices and competitive rates); <u>Marshall</u>, 2019 WL 6975424, at *4 (dismissing consumer protection claim based on statements about competitive rates).  Moreover, Major never stated that Glikin would save money in relation to BGE or other ESCOs.  A promise to charge variable rates based on market conditions and statements of competitive pricing do not guarantee savings.  <u>See</u> <u>Marshall</u>, 2019 WL 6975424, at *3 ("market conditions" pricing term "did not guarantee Plaintiff any savings").  As such, Major's statement of competitive pricing is not actionable.

Glikin claims that Major failed to disclose that: its variable rates are higher than utility rates; variable-rate customers receive "no added benefit" for the same product available from utilities; the conditions that must be present for variable-rate customers to save money over the utility; and that Major makes higher profits on variable-rate customers than its fixed-rate customers.  Compl. ¶¶ 209(a)-(b), (e)-(f), 213(a)-(b), (e)-(f).  "Ordinarily, under Maryland law, a mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions."  <u>Willis v. Bank of Am. Corp.</u>, 2014 WL 3829520, at *18 (D. Md. Aug. 1, 2014).  "Maryland recognizes no general duty upon a party to a

22

transaction to disclose facts to the other party." Md. Envtl. Trust v. Gaynor, 803 A.2d 512, 516 (Md. 2002); see also Todd, 2020 WL 1552769, at *22 (same).  Glikin has not alleged any confidential or fiduciary relationship she had with Major sufficient to give rise to a duty to disclose. In any event, the purported omissions alleged by Glikin are not actionable.

As discussed above, per Richards, ESCOs and utilities do not operate in the same marketplace, and, absent limiting contract language, ESCOs are not required to consider utility rates in setting variable rates based on market conditions.  915 F.3d at 105.  As such, Major had no obligation to disclose to customers how its variable rates compared to utility rates.  Maryland (and New York) made the legislative decision to deregulate the electricity supply market.  That put consumers in the position to shop around for suppliers.  It did not obligate suppliers to inform consumers how its prices compared to competitors' prices.  Volkswagen is not required to inform consumers that a Chevrolet Malibu is available for a price lower than a Volkswagen Passat. Indeed, in dismissing GBL § 349 claims against an ESCO, one court in this Circuit reasoned:

> As to the claim that defendants violated § 349 by failing to disclose that the rates they charged were higher than their competitors' rates, the Court declines to require companies to undermine their marketing efforts by promoting their competitors' services.  To hold otherwise would expose to liability every firm that does not supplement its bills with advertisements for its competitors, an absurd outcome. Moreover, to demand a minimal level of market research from a consumer is not unreasonable.  Insofar as the GBL refers to the behavior of a *reasonable* consumer acting *reasonably*, defendants were entitled to expect that customers would undertake their own research before selecting an energy provider.  Unquestionably, the rates of competing providers were not within defendants' exclusive possession, and **their omission, as a consequence, does not form the basis for a claim under § 349**.

Rovner v. Just Energy Grp., Inc., No. 18-cv-2159, at 20-21 (E.D.N.Y. July 31, 2019), attached as Exhibit B (italics in original and bold emphasis added).

Also, Major made no promise of savings over BGE and, thus, was not obligated to disclose "the conditions that must be present" in order for variable-rate customers to realize savings.

Finally, as the Second Circuit has held, the charging of a higher variable rate after an introductory lower-rate period is a mainstream business practice of a variety of businesses that does not give rise to a consumer protection claim.  Richards, 915 F.3d at 103-04.  Further, the contracts (both of Entrust and NG&E) to which Glikin agreed expressly allowed for the charging of a variable rate after the conclusion of a fixed-rate period.  Regardless of whether or not Major generated higher profits from variable-rate customers, nothing about its offering of fixed and variable rate products is unfair or deceptive, particularly where, as here, consumers have the ability to cancel their variable-rate service at any time without penalty.  Id. at 103-04, 104 n.10.

Glikin further alleges that Major failed to provide customers "adequate advance notice of the variable rates it would charge" or disclose its "variable rate methodology."  Compl. ¶¶ 209(c)-(d), 213(c)-(d).  But Glikin points to no Maryland law or regulation requiring that variable-rate customers be provided advance notice of an ESCO's variable rates or that a more specific variable pricing methodology be disclosed.  Here, the contract terms assigned to Major informed Glikin that she would be charged a variable electricity rate that may fluctuate month to month based on "market conditions," including "market pricing of commodity, transportation, *profit*, and other market price factors."  If Glikin were displeased with the rates charged or the explanation of how the rates were calculated, she was free to terminate her services with Major at any time.

Consequently, given Glikin's failure to plead facts establishing a duty to disclose on the part of Major or that Major otherwise made actionable misrepresentations or omissions, her MCPA, fraud, and "unfair and deceptive acts and practices" claims fail as a matter of law.

### 5.    Glikin's Unjust Enrichment Claim (Count VIII) Fails.

Glikin's unjust enrichment claim fails because her claims are governed by a contract that she claims is "valid."  Compl. ¶ 167.  Indeed, "[a]n unjust enrichment claim may not be brought

when the subject matter of the claim is governed by a contract."  Hebbeler v. First Mariner Bank, 2020 WL 1033586, at *24 (D. Md. Mar. 2, 2020).   "Because an express contract exists between the parties," Glikin cannot assert an unjust enrichment claim against Major.  Daniyan, 2015 WL 4031752, at *4.  Nevertheless, Glikin claims that it would be unjust for Major to retain payments "made for excessive energy charges."  Compl. ¶ 225.  In other words, Glikin expected to pay less than she did.  That alone does not constitute unjust enrichment.  The contract contained the pricing terms by which Major received a monetary benefit from Glikin and disclosed that these terms included a variable rate.  As that rate was set forth in the contract, Major was not unjustly enriched.

Even if the unjust enrichment claim is not foreclosed by the contract, Glikin has not plausibly pled this claim.  To state an unjust enrichment claim, Glikin must allege:

> (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return.

Hebbeler, 2020 WL 1033586, at *23.  The Todd court dismissed the plaintiff's unjust enrichment claim against an ESCO because the plaintiff did not plead facts suggesting that the ESCO "failed to supply [the plaintiff] with the energy source for which she contracted."  2016 WL 727108, at *8.  Thus, even if the ESCO overcharged the plaintiff, the unjust enrichment claim was deficient. Id.  Likewise, here, although Glikin conferred a benefit on Major by making payments to Major, the resulting "enrichment" was not unjust.  Glikin admits that she received electricity in exchange for the prices she paid.  This is not a case in which she conferred a benefit on an entity and received nothing of value in return.  As such, her unjust enrichment claim fails as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, Major respectfully requests that the Court dismiss the Complaint with prejudice.

Dated: April 5, 2021                  ECKERT SEAMANS CHERIN
      White Plains, New York      & MELLOTT, LLC

By: /s/ *Kelly Robreno Koster*
Kelly Robreno Koster
10 Bank Street, Suite 700
White Plains, NY 10606
(914) 286-2807
kkoster@eckertseamans.com

Kevin P. Allen (*pro hac vice forthcoming*)
Thomas E. Sanchez (*pro hac vice*)
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
(412) 566-6000
kpallen@eckertseamans.com
tsanchez@eckertseamans.com

*Counsel for Defendant*

26